OPINION OF THE COURT
TABLE OF CONTENTS
Page
I. INTRODUCTION........................................................1081
II. THE MEGAN’S LAW SCHEME...........................................1081
III. THE PRIOR PROCEEDINGS.............................................1087
IV. THE ROOKER-FELDMAN ISSUE........................................1090
V. THE EX POST FACTO AND DOUBLE JEOPARDY ISSUES................1092
A. The Artway Standard.................................................1093
B. The Impact Of Ursery And Hendricks..................................1093
C. Legislative Purpose...................................................1096
*1081 Page
.1097 D. Objective Purpose............................
. 1101 E. Effects......................................
. 1105 F. Satisfaction Of The Artway Test................
VI. THE PROCEDURAL DUE PROCESS ISSUES..... 1105
A. Deprivation Of A Liberty Interest.............. 1105
B. Standards For Determining The Process Due. ... 1106
C. Allocation Of The Burden Of Persuasion......... 1107
D. Extent Of The State’s Evidentiary Burden....... 1110
VII. CONCLUSION.................... 1111
STAPLETON, Circuit Judge:
I. INTRODUCTION
On July 29, 1994, Megan Kanka, a seven year old child, was abducted, raped, and murdered near her home. The man who confessed to Megan’s murder lived in a house across the street from the Kanka family and had twice been convicted of sex offenses involving young girls. Megan, her parents, local police, and the members of the community were unaware of the accused murderer’s history; nor did they know that he shared his house with two other men who had been convicted of sex offenses.
By October 31, 1994, New Jersey had enacted the Registration and Community Notification Laws, Pub.L.1994, Chs. 128, 133 (codified at N.J.S.A. 2C:7-1 to 7-11) as part of a ten-bill package collectively referred to as “Megan’s Law.” This legislation required registration by those who had committed certain designated crimes involving sexual assault and provided for the dissemination of information about those required to register. Other states followed suit with their own versions of Megan’s Law and Congress passed a statute requiring a state program of registration and notification as a condition of receiving certain federal funds. By May of 1996, forty-nine states had adopted sex offender registration laws and thirty-two states maintained some form of community notification program.
We have before us challenges to the constitutionality of the notification requirements of New Jersey’s Megan’s Law based on the Ex Post Facto, Double Jeopardy, and Due Process Clauses of the United States Constitution. The issues before us are difficult but relatively narrow. We are not called upon to decide whether Megan’s Law can constitutionally be applied to one who has committed one of the designated sex crimes after its enactment. Nor, of course, is it our responsibility to determine whether the policy judgments reflected in Megan’s Law are prudent ones.
We hold that (1) the notification requirements of Megan’s Law do not constitute state inflicted “punishment” on Tier 2 and Tier 3 registrants for purposes of the Ex Post Facto and Double Jeopardy Clauses; (2) the Due Process Clause of the United States Constitution forecloses New Jersey from placing the burden of persuasion on the registrant in a proceeding challenging a Tier 2 or Tier 3 classification and notification plan; and (3) the Due Process Clause requires the state at such a proceeding to shoulder the burden of justifying the classification and notification plan by clear and convincing evidence.
II. THE MEGAN’S LAW SCHEME
A.
Public reaction to Megan’s murder was intense, and New Jersey’s governor and legislature responded quickly. By August 15, 1994, two weeks after the discovery of Megan’s body, bills providing for registration and community notification had been introduced in the General Assembly. Two weeks later, the General Assembly declared the bills an “emergency,” allowing them to bypass committee and be passed the same day.
In the Senate, no registration or notification bills had been introduced as of August 29, 1994. However, the Law and Public *1082 Safety Committee held a hearing upon pending legislation that pre-dated Megan’s Law and would have required victim notification on the release of offenders. In connection with its consideration of that legislation, the Committee received testimony and/or written reports from, inter alia, the American Civil Liberties Union, municipal officials, inmates, state and federal legislators, and the Attorney General on issues related to sex offender registration and community notification. Registration and community notification bills identical to their General Assembly counterparts were introduced in the Senate on September 12, 1994. After hearing testimony from the ACLU, the New Jersey Coalition of Crime Victims, and corrections officials on September 26, 1994, the Senate Law and Public Safety Committee revised the bills by: (1) supplementing the list of crimes which require registration,[1] (2) directing the Attorney General to consult with a twelve-member Advisory Council of experts to establish guidelines concerning the risk of reoffense, (3) identifying certain factors material to the determination of risk of reoffense, and (4) narrowing the scope of community notification. The Committee then favorably reported the amended versions to the Senate, see Senate Law & Pub. Safety Comm., Statement to Substitute for Senate Bill No. 14 & Assembly Bill No. 85 (N.J. Sept. 26, 1994), which approved the bills on October 3. The General Assembly followed suit by debating and approving the revised bill on October 20, 1994, and Governor Whitman signed it into law on October 31,1994.
B.
Megan’s Law establishes both a registration requirement and a three-tiered notification program. See Artway v. Attorney General, 81 F.3d 1235, 1243 (3d Cir.1996). The registration provisions were the subject of this court’s decision in Artway, where we upheld their constitutionality in the face of ex post facto, double jeopardy, bill of attainder, due process, equal protection, and vagueness challenges. We there summarized the operation of the registration provision:
The registration provision requires all persons who complete a sentence for certain designated crimes involving sexual assault after Megan’s Law was enacted to register with local law enforcement. N.J.S.A. 2C:7-2b(l). Those committing these offenses and completing all incarceration, probation, and parole before the Law’s enactment must register only if, at the time of sentencing, their conduct was found to be “characterized by a pattern of repetitive and compulsive behavior.” Id.
The registrant must provide the following information to the chief law enforcement officer of the municipality in which he resides: name, social security number, age, race, sex, date of birth, height, weight, hair and eye color, address of legal residence, address of any current temporary legal residence, and date and place of employment. N.J.S.A. 2C:7-4b(l). He must confirm his address every ninety days, notify the municipal law enforcement agency if he moves, and re-register with the law enforcement agency of any new municipality. N.J.S.A. 2C:7-2d to e.
The registration agency then forwards the registrant’s information, as well as any additional information it may have, to the prosecutor of the county that prosecuted the registrant. N.J.S.A. 2C:7-4c to d. The prosecutor, in turn, forwards the information to the Division of State Police, which incorporates it into a central registry and notifies the prosecutor of the county in which the registrant plans to reside. Id. This information is available to law enforcement agencies of New Jersey, other states, and the United States. N.J.S.A. 2C:7-5. The registration information is not open to public inspection.... Failure of the sex offender to comply with registra *1083 tion is a fourth-degree crime. [N.J.S.A. 2C:7-2a.]
81 F.3d at 1243. The registration requirement persists for a period of 15 years from the date of conviction or the date of release from a correctional facility, whichever is later. It is only after this 15 year period that a registrant may make application to the Superior Court to terminate the obligation to register. The obligation may be terminated only upon a persuasive showing that the registrant is not likely to pose a threat to the safety of others. N.J.S.A. 2C:7-2f.
C.
The registration information provides a basis for the next step — notification. The prosecutor of the county where the sex offender intends to reside and the prosecutor from the county of conviction use the registration information and other data to jointly assess the risk of reoffense by the registered individual. N.J.S.A. 2C:7-8d(l). They determine whether the sex offender poses a low (Tier 1), moderate (Tier 2), or high (Tier 3) reoffense risk. N.J.S.A. 2C:7-8e. Every registrant at least qualifies for Tier 1 treatment, otherwise known as “law enforcement alert,” where notification extends only to law enforcement agencies likely to encounter the registrant. N.J.S.A. 2C:7-8c(l). In the case of those registrants posing a moderate risk of reoffense, Tier 2 notification, or “law enforcement, school and community organization alert,” issues to registered schools, day care centers, summer camps, and other community organizations which care for children or provide support to women and where individuals are likely to encounter the sex offender. N.J.S.A. 2C:7-8e(2). The high risk registrants merit Tier 3’s “community notification,” where members of the public likely to encounter the registrant are notified. N.J.S.A. 2C:7-8e(3).
In order to preserve uniformity in the tier classification and notification process, the state Attorney General, in consultation with an advisory council, is required to develop and promulgate guidelines to be consulted by prosecutors in assessing the degree of risk of reoffense. N.J.S.A. 2C:7-8a, d. By statute, the guidelines are required to include the following considerations:
(1) Conditions of release that minimize risk of reoffense, including but not limited to whether the offender is under supervision of probation or parole; receiving counseling, therapy or treatment; or residing in a home situation that provides guidance and supervision;
(2) Physical conditions that minimize risk of re-offense, including but not limited to advanced age or debilitating illness;
(3) Criminal history factors indicative of high risk of reoffense, including:
(a) Whether the offender’s conduct was found to be characterized by repetitive and compulsive behavior;
(b) Whether the offender served the maximum term;
(c) Whether the offender committed the sex offense against a child;
(4) Other criminal history factors to be considered in determining risk, including:
(a) The relationship between the offender and the victim;
(b) Whether the offense involved the use of a weapon, violence, or infliction of serious bodily injury;
(c) The number, date and nature of pri- or offenses;
(5) Whether psychological or psychiatric profiles indicate a risk of recidivism;
(6) The offender’s response to treatment;
(7) Recent behavior, including behavior while confined or while under supervision in the community as well as behavior in the community following service of sentence; and
(8) Recent threats against persons or expressions of intent to commit additional crimes.
N.J.S.A. 2C:7-8b.
Pursuant to this statutory delegation of authority, the Attorney General has developed guidelines for law enforcement for classification and notification. See Guidelines for Law Enforcement for Notification to Local Officials and/or the Community of the Entry of a Sex Offender into the Community, June 1, 1996 (“Guidelines”). The Attorney Gener *1084 al’s Guidelines require the prosecutors to use the Registrant Risk Assessment Scale (the “Scale”), a numerical scoring system designed with the assistance of mental health and law enforcement professionals, to evaluate the degree of risk of the sex offender. See Registrant Risk Assessment Scale Manual, Oct. 3, 1995 (“Manual”). The New Jersey Supreme Court has said of the creation of the Scale:
A Committee of mental health professionals and legal experts ... developed the Scale. They examined risk assessment scales being used in the United States and Canada. After reviewing the scientific literature, the Committee selected for inclusion in the Seale those factors that met two conditions. First, all of the factors selected had to be empirically supported in the risk assessment field as criteria positively related to the risk of re-offense. Second, all of the factors selected had to be fairly concrete criteria that could be gathered in a consistent and reliable manner.
In re C.A., 146 N.J. 71, 679 A.2d 1153, 1169 (1996).
The Scale itself is a matrix with thirteen factors grouped into four general categories: (1) Seriousness of Offense; (2) Offense History; (3) Characteristics of Offender; and (4) Community Support. See Artway, 81 F.3d at 1244.[2] Guided by the promulgated examples and commentary, the prosecutors determine whether the registrant poses a low, moderate, or high risk to the community under each of the factors and assign zero, one, or three points, respectively, for each factor. Then the prosecutors multiply these raw scores by a coefficient, reflective of the relative weight attributed to the various general categories by the creators of the Scale; raw scores for factors under Seriousness of Offense are multiplied by five, under Offense History by three, under Characteristics of Offender by two, and under Community Support by one. Prosecutors total the resulting amounts and place the registrant in the appropriate tier: Tier 1, low risk — 0 to 36 points; Tier 2, moderate risk — 37 to 73 points; and Tier 3, high risk — -74 to 111 points. Finally, the prosecutors consider the applicability of two exceptions:
1) If an offender has indicated that he will reoffend if released into the community and the available record reveals credible evidence to support this finding, then the offender will be deemed to be a high risk of reoffense regardless of the weighting procedure; and 2) if the offender demonstrates a physical condition that minimizes the risk of reoffense, including but not limited to advanced age or debilitating illness, then the offender will be deemed to be a low risk of reoffense regardless of the outcome of the weighting procedure.
Manual at 1; see Artway, 81 F.3d at 1244.
While the class of those who receive notification differs depending on a registrant’s classification, the type of information distributed is the same regardless of the classification. The package of information provided includes the registrant’s name, a recent photograph, a physical description, the offense of conviction, home address, place of employment or schooling, and a vehicle description and license plate number. “Those notified under Tier 2 are informed that the information is not to be shared with the general public, and every notification must contain a warning about the criminal consequences of vandalism, threats and assaults against the registrant or any of his associates.” Artway, 81 F.3d at 1244.[3]
*1085 D.
The New Jersey courts have played an active role in refining and developing the Megan’s Law scheme. See In re G.B., 147 N.J. 62, 685 A.2d 1252 (1996); In re C.A., 146 N.J. 71, 679 A.2d 1158 (1996); Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995). In Doe, the New Jersey Supreme Court upheld the constitutionality of Megan’s Law and read into the statute and Guidelines certain additional procedures designed to prevent any “excessiveness of community notification.” 662 A.2d at 381. First, the Court added the “likely to encounter” the registrant restriction to Tier 2 notification. I'd[4] As a result of the Doe decision, a prosecutor who has classified a registrant in Tier 2 must make an “individual determination” concerning the appropriate institutions and organizations to include in the notification program he creates. Id As articulated in the Guidelines, “[t]he decision as to which groups should appropriately be notified should be made on a case-by-case basis, following careful review.” Guidelines at 11. There is no “automatic inclusion of an organization simply because it is ‘registered’” with the local law enforcement agencies; rather, “likely to encounter” requires “having a fair chance to encounter” the registrant. Doe, 662 A.2d at 385. The Guidelines interpret the Court’s articulations to mean that the types of interactions which occur at the location and their attendant circumstances must demonstrate that contact with the offender is “reasonably certain.” Guidelines at 6-7. They provide, for example, that if a registrant regularly stops at a gas station merely to refuel, there would not be a “fair chance to encounter” him there. Id. at 7.
Ordinarily, the “critical” factor for “ ‘likely to encounter’ is geography — how close is the institution or organization, in the ease of Tier Two notification, to the offender’s residence or place of work or school.” Doe, 662 A.2d at 385. However, the New Jersey Supreme Court explained:
In some municipalities, not every institution or organization that would otherwise qualify for notification may be close enough to warrant same, but in some eases, ... institutions or organizations in other municipalities may be close enough. The same observations can be made for Tier Three notification. We do not attempt to define the area around the offender’s residence or place of work or school that may be included within the notification process, and assume it may differ from one locale to another. Depending upon the particular offender, factors other than geography may be considered if they are relevant to the offender’s likely whereabouts, such as an offender’s proclivity for certain locations, and geographic considerations may be affected by the nature of the offender’s characteristics and the institution in question, e.g., a repetitive and compulsive pedophile and a large elementary school.
Id. 662 A.2d at 385-86.
Moreover, the Guidelines provide that notification must be appropriately tailored to reach those members of the public who are at risk from the particular offender. The tailoring must include consideration of the relationship between the registrant and his prior victims. As the Guidelines suggest, sex offenders who have only victimized members of their own households may not pose a threat to most members of the community, and those that have targeted adult women may be of little risk to children; thus, the prosecutor may appropriately limit notification as all registered community organizations are not “likely to encounter” the offenders in either example.
Doe also added to the Megan’s Law scheme a requirement that the prosecutor provide the registrant with notice of a Tier 2 or Tier 3 classification and the proposed notification plan. Id. 662 A.2d at 382. The Court insisted that the written notice describe the manner and details of the notification plan and inform the registrant of his rights to retain counsel and to challenge the prosecutor’s decisions. However, the Court “realize[d] that in some cases it may be *1086 impossible as a practical matter to give such notice, or to give it timely, and in those cases it may be dispensed with.” Id. The Guidelines elaborate on dispensing with the notice requirement:
[I]f a Prosecutorf’s] Office does not receive notification of release of a person determined to be a Tier 3 offender until after the date of release, then, in order to protect the public, notice to the offender may be dispensed with. The Prosecutor’s Office may apply to the designated judge for an order allowing notification to take place without service of notice to the offender, upon receipt of the judge’s order. This may occur, for example, when an offender who has been civilly committed is released on short notice by a judge.
Also, cases will arise where registrants will avoid service of the notice. In those cases, the Prosecutor’s Office may apply to the designated judge for an order allowing notification to take place without service of notice to the offender, where the Prosecutor can demonstrate that every good faith effort was made within the allotted time-frame to serve the registrant. If service has not been completed within 3 days of the date that the tier decision is made, then the Prosecutor may apply to the court for the order allowing notification to occur without notice to the registrant.
Guidelines at 17-18.
Finally, Doe required the state to make available a pre-notification judicial review process for sex offenders who wish to contest their classification or the notification plan. 662 A.2d at 382. The registrant bears the burden of persuasion in these summary, in camera proceedings, where the court decides only whether to affirm or reverse the prosecutor’s determination. Thus, where the state has met its burden of presenting evidence that “prima facie justifies the proposed level and manner of notification,” the court will affirm the prosecutor’s determination “unless it is persuaded by a preponderance of the evidence that it does not conform to the laws and Guidelines.” Id. 662 A.2d at 383. The “only issue for the court on the Tier level of notification is the risk of reoffense;” review of the notification plan largely involves interpretation and application of the “mandatory” limits on notification, such as the “likely to encounter” standard, articulated in the Doe opinion. Id. 662 A.2d at 383-84. Still, the courts are to understand that “the Scale is merely a tool,” In re G.B., 685 A.2d at 1261, and they are cautioned not to “blindly follow the numerical calculations” but to make a “case-by-case” determination regarding tier classification and scope of notification. In re C.A., 679 A.2d at 1171-72.
The New Jersey Supreme Court has recognized that “a registrant is entitled to lodge three distinct challenges to his tier designation”:
First, a registrant may introduce evidence that the calculation that led to the Scale score was incorrectly performed either because of a factual error, because the registrant disputes a prior offense, because the variable factors were improperly determined, or for similar reasons. Second, a registrant may introduce evidence at the hearing that the Scale calculations do not properly encapsulate his specific case; or phrased differently, a registrant may maintain that his case falls outside the “heartland” of cases and, therefore, that he deserves to be placed in a tier other than that called for by the prosecutor’s Scale score. Finally, a registrant may introduce evidence that the extent of notification called for by his tier categorization is excessive because of unique aspects of his ease. Challenges to the Scale itself, or challenges to the weight afforded to any of the individual factors that comprise the Scale, are not permitted. Instead, all challenges must relate to the characteristics of the individual registrant and the shortcomings of the Scale in his particular case.
In re G.B., 685 A.2d at 1264.
The registrant’s hearing “is civil, not criminal, and remedial, not adversarial.” In re C.A., 679 A.2d at 1164. It follows the “format ... for probation violation hearings” in New Jersey. Id. 679 A.2d at 1166. The court possesses broad discretion over whether and to what extent witnesses and cross examination will be allowed. Doe, 662 A.2d at 382-83. Rules of evidence do not apply, and the court may rely on documentary evi *1087 dence, such as expert opinions, for all issues. Id. 662 A.2d at 388. Reliable hearsay is admissible. In re C.A., 679 A.2d at 1165. Moreover, “non-conviction offenses [i.e., criminal activities that have not been the subject of a conviction] are to be considered in evaluating a registrant’s risk of re-offense, provided there is sufficient evidence that the offense occurred.” Id. 679 A.2d at 1162.
Where the proof, whether in the form of reliable hearsay, affidavits, or offers of live testimony, creates a genuine issue of material fact that the tier designation or manner of notification is inappropriate, “then the trial court should convene a fact-finding hearing and permit live testimony.” Id. 679 A.2d at 1166. Both sides may use expert testimony, but the proceedings are not to be converted into “long drawn-out contests between experts.” Doe, 662 A.2d at 384. Thus, courts must permit registrants to introduce expert testimony which tends to establish that the Scale does not properly account for aspects of the registrant’s character or prior offense, where those aspects are relevant and material to the tier classification, and, in the court’s opinion, would assist in the disposition of the ease. In re G.B., 685 A.2d at 1265-66.
E.
In Artway, we sustained the constitutionality of the provisions of Megan’s Law requiring registration and Tier 1 notification. We declined, however, to address the accompanying constitutional challenge to the provisions requiring the broader notification authorized for Tier 2 and Tier 3 classifications. We found that challenge unripe in large part because the plaintiff there had not been classified and had not received a notification plan. We also noted that the record there lacked evidence of the effects of notification on the community. 81 F.3d at 1250. For purposes of the ensuing discussion, we will follow the convention established in our Art-way opinion, whereby “registration” includes Tier 1 notification and “notification” refers to Tier 2 and Tier 3 notification. Id., 81 F.3d at 1244.

III. THE PRIOR PROCEEDINGS

We have two actions before us: E.B. v. Vemiero, and W.P. v. Vemiero. They involve identical challenges to Megan’s Law; each alleges that notification violates ex post facto, double jeopardy, and procedural due process protections conferred by the United States Constitution. The plaintiffs in both actions are sex offenders who were convicted of their offenses prior to the enactment of Megan’s Law. The plaintiff in the individual action, E.B., comes within the broad language defining the class certified in W.P., constituting:
All persons required to register as a sex offenderfsic ] pursuant to N.J.S.A. 2C:7-1 et seq. and whose offenses were committed prior to October 31,1994, the effective date of the New Jersey Registration and Community Notification Laws, and who have been or will be classified as a tier II or tier III offender.
W.P. v. Poritz, 931 F.Supp. 1187, 1192 (D.N.J.1996). The defendants in E.B. are the Attorney General, the local county prosecutor, and the police chief, while in W.P. they are the Attorney General and various county prosecutors.
A.
In 1974, E.B. pled guilty in New Jersey Superior Court to three offenses of sexual abuse against young boys and received a thirty-three-year sentence. Two years later, he pled guilty in the Circuit Court in Peters-burg, Virginia, to two separate murders and was sentenced to concurrent terms of twenty years of incarceration in that state to run consecutive to the New Jersey sentence. In 1979, after serving less than six years of his thirty-three-year New Jersey sentence, E.B. was paroled and extradited to Virginia to serve the murder sentences. On June 15, 1989, E.B. was paroled by Virginia. He is now free, subject to supervised release by the New Jersey Bureau of Parole until July 23, 2006.
Pursuant to Megan’s law, E.B. registered with the authorities in Englewood, New Jersey. On October 24, 1995, the Bergen County Prosecutor’s Office notified E.B. that he was classified as a Tier 3 sex offender and *1088 proposed to issue notification to “all public and private educational institutions and organizations within a one-half mile radius of the Plaintiff’s home, and all parties who resided or worked within a one block radius of the Plaintiffs home.” E.B. Complaint at ¶ 13. Upon E.B.’s objection to the classification and notification, a hearing was held in New Jersey Superior Court, Law Division. On December 18, 1995, the court ruled that the classification was appropriate and permitted notification to: (1) 82 public and private educational institutions, licensed day care centers and summer camps in Englewood, Teaneck, Bergenfield, Tenafly, Englewood Cliffs, Leonia and Fort Lee, and (2) all residences within a one block radius of E.B.’s house. E.B.’s appeals to the Appellate Division and the State Supreme Court were unsuccessful, but notification remained stayed by court order during the pendency of the proceedings.
E.B. then filed his federal action. The district court entered a preliminary injunction, enjoining the defendants from implementing notification. E.B. v. Poritz, 914
F.Supp. 85 (D.N.J.1996). Defendants appeal from that order and a subsequent order denying their application for a stay of the preliminary injunction.
B.
Seven plaintiffs filed the initial complaint in W.P. in January 1996. Two months later, when the court certified the class, there were 22 representative plaintiffs, all classified as either Tier 2 or Tier 3 and facing prosecutors’ notification plans ranging in scope from notification of three schools to notification of all schools, day care centers, and registered community organizations in the city of Trenton, as well as all residents within a certain area of the city. Some of the representative plaintiffs had sought relief from a state court and were subject to the resulting state court orders. The district court promptly entered a preliminary injunction preventing notification for any of the class members. W.P. v. Poritz, 931 F.Supp. 1187 (D.N.J.1996).[5]
Thereafter, the court entered summary judgment for the defendants. W.P. v. Poritz, 931 F.Supp. 1199 (D.N.J.1996). Plaintiffs filed this appeal from the entry of summary judgment.
C.
The record in these eases contains affidavits from registrants and state authorities, the Attorney General’s publications concerning the Seale, registration and notification data, newspaper articles, and reports from other jurisdictions maintaining notification programs. The district court held the plaintiffs’ constitutional claims were ripe for review, and no one has challenged that determination on appeal.
New Jersey’s Administrative Office of the Courts reports that, as of May 6, 1996, there were 528 registrants designated as Tier 1; 585 as Tier 2; and 59 as Tier 3; or 45 percent, 50 percent, and 5 percent, respectively, of all classified registrants. According to the county prosecutors, as of May 16, 1996, notification was completed for 135 out of the 644 individuals classified to Tier 2 or Tier 3. Administrative Office information also indicates that of the 117 registrants who pursued their notification challenges to a resolution, 62 had their tier levels affirmed. Fifty-two challenges resulted in changed tier classifications and 13 resulted in modification of the scope of notification.
The record contains anecdotal evidence concerning the experiences of a total of at least nineteen sex offenders in New Jersey.[6] *1089 In only six of these cases had state-compelled notification under Megan’s Law been carried out. In the remaining cases, members of the community had received information about the sex offenders from sources other than a Megan’s Law notification.[7] In all the cases, the sentenced offender had experienced adverse repercussions. Loss of employment, eviction, and verbal abuse were not uncommon. Vandalism and threats were experienced but considerably less frequently. Two registrant affidavits speak of physical assaults following notification. One registrant reported being physically attacked on three separate occasions. In another case, a father and son broke into the registrant’s residence and assaulted a house guest whom they mistook for the sex offender. Police arrived on the scene and arrested the assailants, who were later prosecuted and convicted for criminal trespass.
According to law enforcement records, the 135 cases in which Tier 2 and Tier 3 notifications have been completed' have produced only a single instance of a physical assault being reported to the authorities — the father and son attack on the person mistaken for a registrant. In addition, there was a total of four reports to law enforcement personnel of threats, harassment, or other offensive actions. In Bergen County, one Tier 3 registrant contacted the local police department and reported that his mother’s car had been vandalized. In Somerset County, a juvenile who registered under Megan’s Law reported to police that a harassing note had been left on his ear at school. In Sussex County, the prosecutor’s office received a call from the wife of a Tier 3 registrant who reported that a threatening note had been mailed to the registrant’s home. In Atlantic County, a Tier 2 registrant’s employer reported that the local school had disclosed the employment of the registrant and a boycott was planned for the employer’s restaurant. The police defused the situation by contacting the potential picketers and the school’s principal, who agreed to speak to his staff concerning the confidentiality of information received through notification.
The record also includes information from the registration and notification experiences of other jurisdictions. A review of community notification in Washington state found that of the 176 notifications completed between March 1990 and March 1993, 14 incidents of harassment were reported, ranging in severity from multiple incidents of verbal abuse to a death threat and one assault.[8]
In addition, the record contains a January 1995 study by the Oregon Department of Corrections, undertaken to investigate the impact of the first 14 months of the state’s 1993 community notification statute. Even before this statute, probation and parole officers with a sex offender under supervision had provided notification to “local police; immediate and extended family members in contact with the offender; victims; other residents in the offender’s home; regular visitors to the home; employers; therapists; Children’s Services Division; landlords and apartment managers; ministers, pastors, and *1090 other officials. where the offender attends church; select neighbors; specific business[es] frequented by the offender; and close associates to the offender.” Oregon Dep’t of Corrections, Sex Offender Community Notification in Oregon at 7 (Jan.1995). This practice continued after enactment of the statute requiring notification to “a broader public.” As of the time of the study, there had been 237. notification plans submitted under the new law-. In this context, the Oregon Department of Corrections reported as follows:
In January 1995, forty-five parole/probation sex offender specialists from thirty-five counties responded to a survey of their experience with Community Notification. These officers were responsible for a total caseload of 2,160 sex offenders. The following information was gained from the surveys and [Sex Offender Supervision] Network discussions:
* * * * * *
Less than 10% of offenders experienced some form of harassment. Incidents reported included name calling, graffiti, toilet papering and minor property vandalism, monitoring of a home by video camera, repeated reports of unfounded violations to parole/probation officers, and picketing of residences.
There were two extreme cases of retaliation. One sex offender had a gun pointed at him and was threatened. In another ease, a victim had tires slashed and the offender was blamed. Although the offender passed a polygraph and was accountable for the time, there were threats made that the offender’s home would be burned down.
******
Other circumstances reported by parole/probation officers included:
Community notification has made it more difficult to find residences for some sex offenders released from prison.
******
Notification has [affected] employment opportunities for sex offenders.
* * * * * *
Businesses who were initially willing quietly to employ a sex offender sometimes do not provide jobs when the hiring will clearly become public.
Id. at 12-14.
IV. THE ROOKER-FELDMAN ISSUE
There is a threshold jurisdictional issue for decision. The appellants in E.B. contend that the district court was without subject matter jurisdiction under the doctrine articulated by the Supreme Court in Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Section 1257 of Title 28 of the United States Code bestows upon the Supreme Court of the United States appellate jurisdiction to review final judgments of the highest courts of the respective states. The so-called Rooker-Feldman doctrine teaches that, by negative implication, the inferior federal courts lack subject matter jurisdiction to review judgments of those courts. We have interpreted the doctrine to encompass final decisions of lower state courts as well. See Port Auth. Police Benevolent Ass’n, Inc. v. Port Auth. of N.Y. & N.J., 973 F.2d 169, 177-78 (3d Cir.1992).
Appellants point out that E.B. demanded and received judicial review of the prosecutor’s Tier 3 classification and notification plan and that he advanced federal constitutional arguments in that proceeding for preventing the classification and notification plan from being put into effect. See Tr. Megan’s Law Hearing (N.J.Super.Ct. Law Div. Dec. 7, 1995) at 6-9. The Superior Court, Law Division, after a hearing, rejected E.B.’s challenge and ordered that notification be given. E.B. appealed to the Appellate Division, which affirmed. The Supreme Court of New Jersey thereafter denied E.B.’s petition for certification of appeal. As appellants stress, the relief E.B. seeks in this proceeding is an injunction directing that the notification ordered by the New Jersey Superior Court, Law Division, not be carried out.
We agree with appellants that this is a paradigm situation in which Rooker-Feld *1091 man precludes a federal district court from proceeding. To grant E.B. relief would require an inferior federal court to determine that the New Jersey court’s judgment was erroneous and would foreclose implementation of that judgment. See FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir.1996).
The district court reached a contrary conclusion because it believed that although E.B. raised constitutional issues, he “was denied an opportunity to meaningfully raise constitutional challenges to Megan’s Law.” 914 F.Supp. at 89 (emphasis supplied). Its belief was based primarily on the fact that the Supreme Court of New Jersey in Doe had described a Megan’s Law proceeding in the trial court as a “summary proceeding” and had stated that “the only issue for the court on the Tier level of notification is the risk of reoffense.” Id. 914 F.Supp. at 89-90; Doe, 662 A.2d at 382-83. This suggested to the district court that the New Jersey courts do not consider constitutional challenges in a Megan’s Law proceeding. 914 F.Supp. at 90.
If we shared the belief of the district court that E.B.’s constitutional challenges were not considered by the New Jersey courts — and, under Doe, could not be considered by them — we would also conclude that Rooker-Feldman did not deprive the district court of jurisdiction. However, we do not read the Doe opinion as instructing New Jersey courts to ignore properly raised claims based on the federal Constitution,[9] and it is clear that the New Jersey courts do not so read that opinion. In In re G.B., 286 N.J.Super. 396, 669 A.2d 303, 306 (N.J.Super.Ct.App.Div.1996), aff'd, 685 A.2d 1252, the Appellate Division considered constitutional challenges and rejected them on the merits because these same issues had been previously considered and rejected in Doe. Shortly thereafter, the Superior and Supreme Courts of New Jersey, in appeals from a denial of relief in a Megan’s Law proceeding, addressed constitutional challenges to Megan’s Law for which there was no binding precedent. See In re C.A., 679 A.2d at 1153. Even if there were not this clear evidence, however, we would have to “assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary.” Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 15, 107 S.Ct. 1519,1528, 95 L.Ed.2d 1 (1987).
The only remaining issue with respect to E.B. and the Rooker-Feldman doctrine is whether a litigant can be said to have a meaningful opportunity to raise an issue in a state proceeding when the highest court of that state has rejected, in another litigant’s case, the same argument the litigant wishes to raise. Our answer is in the affirmative.
Rooker-Feldman abstention is necessary to preserve the United States Supreme Court’s appellate jurisdiction — as well as to limit federal court review of state court decisions to the avenue provided for such by Congress. See Ernst v. Child and Youth Services of Chester County, 108 F.3d 486, 491 (3d Cir.1997). The federal court structure established by Congress intends that only the Supreme Court have the opportunity to decide that a state court has reached an erroneous conclusion on a federal constitutional claim. Nothing suggests that this structure should be altered where the state court’s decision is based upon what is already settled precedent in that state.
As we have previously observed, the interests served by Rooker-Feldman are quite similar to those served by giving a state court judgment res judicata effect in a subsequent federal proceeding. Marks v. Stinson, 19 F.3d 873, 885-86 n. 11 (3d Cir.1994); Valenti v. Mitchell, 962 F.2d 288, 297 (3d Cir.1992). If a litigant resorts to a state court and suffers an adverse judgment, a lower federal court must respect that judgment unless and until it is overturned. The litigant’s only remedy is by way of appeal through the state court system and by way of *1092 petition to the Supreme Court of the United States thereafter.[10]
We will, accordingly, reverse the judgment of the district court in E.B.’s case[11] and remand with instructions to dismiss for want of subject matter jurisdiction.
This does not mean, however, that the district court lacked jurisdiction over the class claims in W.P. As we concluded in Valenti, 962 F.2d at 298, “ Rooker-Feldman does not bar individual constitutional claims by persons not parties to earlier state court litigation.” In W.P., at least some of the representative plaintiffs were not the subject of any kind of judicial order when they filed this suit to secure injunctive relief against enforcement of Megan’s Law. Indeed, neither they nor the state had petitioned any state court for any relief. The claims of these class plaintiffs were sufficient to confer subject matter jurisdiction [12] on the district court.[13]
V. THE EX POST FACTO AND DOUBLE JEOPARDY ISSUES
The Ex Post Facto Clause forecloses retroactive application of a law that “inflicts a greater punishment, than the law annexed to the crime, when committed.” Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). The Double Jeopardy Clause forbids “multiple punishments for the same offense.” United States v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). Accordingly, neither clause is implicated unless the state has inflicted “punishment.” Since no one here suggests that “punishment” has a different meaning under one of these clauses than under the other, the critical issue to which we now turn is whether the notification called for in situations involving Tier 2 and Tier 3 registrants is “punishment” for purposes of the Ex Post Facto and Double Jeopardy Clauses.
*1093 A. The Artway Standard
In Artway, when we addressed the issue of whether registration under Megan’s Law constituted “punishment,” we found no Supreme Court precedent addressing a similar statutory provision. In order to “divine” a “test for punishment,” we reviewed the Supreme Court case law and looked for common considerations. 81 F.3d at 1254-63. Recognizing “that the appropriate ‘punishment’ analysis depends on the context,” we derived an “analytical framework for this case.” Id. 81 F.3d at 1261, 1263. Specifically, we concluded that a “measure must pass a three-prong analysis—(1) actual purpose, (2) objective purpose, and (3) effect—to constitute non-punishment.” Id. 81 F.3d at 1263.
Under this Artway analysis, we first look to whether the adverse effect on individuals results from a desire on the part of the legislature to punish past conduct or is a byproduct of a bona fide legislative effort to remedy a perceived societal problem. “If the legislature intended Megan’s Law to be ‘punishment,’ i.e. retribution was one of its actual purposes, then it must fail constitutional scrutiny. If, on the other hand, ‘the restriction of the individual comes about as a relevant incident to a regulation,’ the measure will pass this first prong.” Id. (quoting De Veau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960)).
The second inquiry—into “objective purpose”—focuses on the operation of the legislative measure and on whether analogous measures have traditionally been regarded in our society as punishment. In Artway, we suggested that there were three aspects of “objective purpose” that should be considered by a court before deciding whether the party challenging the statute has carried its burden of showing that an objective observer in our society would perceive the measure as punitive. Id. It is important to consider the measure’s proportionality— whether the remedial purpose of a legislative measure purporting to be non-punitive can explain all the adverse effects on those involved. While it is true that “even remedial sanctions carry the sting of punishment,” id. 81 F.3d at 1260 (internal quotation marks omitted), only if the sting is not “reasonably related” to the remedial goal would an objective observer be justified in perceiving a punitive purpose, id. 81 F.3d at 1265. It is also important to consider history. If analogous measures have traditionally been regarded by our society as “serving] punitive purposes” and the text and the legislative history do “not make [the legislature’s] plausible remedial purposes clear,” id. 81 F.3d at 1257, there is an objective basis for regarding the measure as punishment. Finally, we noted in Artway that some measures are intended to have a mixed salutary and deterrent effect. The examples we gave were taxes on illegal activities (like possession of drugs) and on activities that the state coneededly wished to discourage. See id. 81 F.3d at 1259. Such mixed measures will not be deemed to have an objectively punitive purpose despite their deterrent purpose unless that deterrent purpose is an unnecessary. complement to the measure’s salutary operation, the measure is operating in an unusual manner inconsistent with its historically mixed purposes, or the deterrent purpose overwhelms the salutary purpose. See id. 81 F.3d at 1263.
“The final prong [of the Artway analysis] examines whether the effects—or ‘sting’—of a measure is so harsh ‘as a matter of degree’ that it constitutes ‘punishment.’ ” Id. 81 F.3d at 1266 (citing California Dep’t of Corrections v. Morales, 514 U.S. 499, 509, 115 S.Ct. 1597, 1603, 131 L.Ed.2d 588 (1995)). This prong necessarily involves difficult line-drawing. Unfortunately, the Supreme Court case law provides only a few fixed points. We know that, under certain circumstances, the “sting” of incarceration or forfeiture of one’s citizenship is sufficiently extraordinary to require a finding of punishment, see Miller v. Florida, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), and we have recently been told that civil commitment of violent sex offenders does not, see Kansas v. Hendricks, — U.S. -, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997).
B. The Impact Of Ursery And Hendricks
There are two recent Supreme Court cases which potentially bear upon our deei *1094 sion: United States v. Ursery, — U.S. -, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), and Kansas v. Hendricks, at -, 117 S.Ct. at 2072. Appellees insist that after Ursery and Hendricks, Artway does not provide an appropriate standard for determining whether Megan’s Law notification constitutes “punishment” for purposes of the Ex Post Facto and Double Jeopardy Clauses. We disagree.
In Ursery, the Supreme Court held that “civil forfeitures ... do not constitute ‘punishment’ for purposes of the Double Jeopardy Clause” even when the value of the property forfeited is arguably excessive when compared to the harm suffered by the government from the conduct giving rise to the forfeiture. — U.S. at -, 116 S.Ct. at 2138. The Court first emphasized that its case law had sharply distinguished between in rem forfeiture proceedings and in person-am civil fine proceedings. It explained that in the latter “it is the wrongdoer in person who is proceeded against ... and punished” while in the former “it is the property which is proceeded against, and by resort to a legal fiction, held guilty and condemned.” Id. at -, 116 S.Ct. at 2145 (quoting from Various Items of Personal Property v. United States, 282 U.S. 577, 580-81, 51 S.Ct. 282, 284, 75 L.Ed. 558 (1931)). Thus, civil forfeitures are not “criminal punishments because they [do] not impose a second in personam penalty for the criminal defendant’s wrongdoing.” Id. at -, 116 S.Ct. at 2141. Second, the Court noted, “[c]ivil forfeitures, in contrast to civil penalties, are designed to do more than simply compensate the Government. Forfeitures ... are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct. [For this reason,] it is virtually impossible to quantify, even approximately, the nonpunitive purposes served by a particular civil forfeiture.” Id. at -, 116 S.Ct. at 2145. Accordingly, while a court can determine whether a civil fine has a punitive component by comparing its size to the harm experienced by the government, a court is not in a position “to determine whether a particular forfeiture bears no rational relationship to the nonpunitive purposes of that forfeiture.” Id.
The holding of Ursery is a narrow one limited to civil forfeitures. Neither of the principal rationales supporting its conclusion is pertinent here and we find nothing in the Court’s reasoning that is inconsistent with the Artway standard.[14] It necessarily follows that Ursery provides no justification for abandoning that standard. See Third Circuit Internal Operating Procedures 9.1.
After the district court’s decision in these cases, the Supreme Court decided Kansas v. Hendricks, at -, 117 S.Ct. at 2072. The Court there upheld a Kansas statute that provides for the civil commitment of “sexually violent predators.” See Kan. Stat. Ann. § 59-29a01 et seq. Under the statute, a person convicted or charged with a violent sexual offense and suffering from a “mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence,” § 59-29a02(a), may be confined to state custody for “control, care and treatment until such time as the person’s mental abnormality or personality disorder has so changed that the person is safe to be at large,” § 59-29a07(a). Prior to Leroy Hendricks’ scheduled release from prison, the state invoked the statute to have him confined as a sexual predator. Hendricks, who had an extensive history of molesting children, challenged the act on substantive due process, ex post facto, and double jeopardy grounds. The Supreme Court rejected all three claims and held that *1095 the state’s involuntary commitment program did not constitute punishment for the purpose of ex post facto or double jeopardy.
Like Ursery, Hendricks does not establish “a single ‘formula’ ” for identifying which legislative measures constitute punishment and which do not. Morales, 514 U.S. at 509, 115 S.Ct. at 1603. However, the context involved in Hendricks — civil commitment of sex offenders — is, obviously, more closely related to the context involved here than was the context of Ursery. In determining the continuing viability of Artway, therefore, we must give careful consideration to how Hendricks addressed the question of whether civil commitment is punishment. We find substantial overlap between the factors relied on in Hendricks and those that comprise the Artway test and we discern no need to abandon (or overhaul) Artway.
The Court’s analysis in Hendricks begins by inquiring into “the legislature’s stated intent,” — U.S. at -, 117 S.Ct. at 2082, just as Artway directs that we begin with the legislature’s actual purpose. The Court found Kansas’ placement of the challenged provision in the probate code instead of the criminal code, and the legislature’s description of its creation as a “civil commitment procedure,” to be evidence of the legislature’s “disavow[ing] any punitive intent.” Id. at -, -, 117 S.Ct. at 2082, 2085. “Nothing on the face of the statute suggested] that the legislature sought to create anything other than a civil commitment scheme designed to protect the public from harm.” Id. at -, 117 S.Ct. at 2082.
Hendricks then goes beyond the legislature’s stated intent to consider additional factors, including those factors Artway incorporates into its objective purpose prong. Like Artway’s inquiry into proportionality, Hendricks repeatedly describes how the Kansas statute is tailored to achieve its remedial purpose of protecting the public. The Court observes that prior criminal conduct is appropriately examined for the narrow evidentiary purpose of predicting dangerousness. See id. The Court also notes that Kansas “limited confinement to a small segment of particularly dangerous individuals,” id. at -, 117 S.Ct. at 2085, and that those affected individuals do not “remain confined any longer than [they] suffer[ ] from a mental abnormality rendering [them] unable to control [their] dangerousness,” id. at -, 117 S.Ct. at 2083. As the Court recognizes, “[f]ar from any punitive objective, the confinement’s duration is instead linked to the stated purposes of the commitment, namely, to hold the person until his mental abnormality no longer causes him to be a threat to others.” Id. Finally, the Court observes that the individuals are subject only to the conditions placed on any involuntarily committed person in a state mental institution and not to the “more restrictive conditions” placed on state prisoners. Id. at -, 117 S.Ct. at 2082.
Hendricks, like Artway, relied heavily on history. In the Court’s view, the confinement involved is “one classic example” in a long history of measures restricting the freedom of the dangerously mentally ill — legislative initiatives which have been consistently held to be nonpunitive. Id. at -, 117 S.Ct. at 2083. The Court specifically analogized the Kansas confinement to the quarantines of those afflicted with highly contagious diseases, and recognized that it has “never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others.” Id. at -, 117 S.Ct. at 2084.
There is also support in Hendricks for Artway’s inquiry into the relationship between a “mixed” measure’s salutary and deterrent purposes. Hendricks discusses the multiple purposes of the Kansas statute, including incapacitation of dangerous sex offenders as well as their treatment, and concludes that the statute would not constitute punishment even if providing treatment were merely an “ancillary purpose” — and not the “primary” purpose — for passing the statute. Id. This is consistent with Artway’s allowance that a measure can be non-punitive even when it does not have solely “salutary” purposes such as treatment.
Though Hendricks does not explicitly discuss what Artway calls the “effects prong,” we find nothing in Hendricks inconsistent with Artway’s direction to examine what the *1096 challenged measure actually does to the affected individuals. This is not to say, of course, that Hendricks lacks implications for the application of the effects prong. The Court held that potentially indefinite civil commitment of dangerous sex predators is not punishment. This provides a new and important “fixed point” that is of great utility in determining on which side of the punitive/nonpunitive line to place community notification.
Although Hendricks thus does not suggest to us that any of the considerations identified as relevant in Artway are no longer relevant to a challenge based on the Ex Post Facto and Double Jeopardy Clauses, we do discern a teaching in Hendricks that we do not discern in the Supreme Court case law preceding Artway. In the course of holding that Kansas’ Sexually Violent Predator Act “does not impose punishment,” id. at -, 117 S.Ct. at 2086, the Hendricks Court made the following cogent observation regarding the deference that must be accorded to the legislature’s judgment as to whether its action is remedial:
Although we recognize that a “civil label is not always dispositive,” Allen [v. Illinois, 478 U.S. 364, 369, 106 S.Ct. 2988, 2992, 92 L.Ed.2d 296 (1986)], we will reject the legislature’s manifest intent only where a party challenging the statute provides “the clearest proof’ that “the statutory scheme[is] so punitive either in purpose or effect as to negate[the State’s] intention” to deem it “civil.” United States v. Ward, 448 U.S. 242, 248-249, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980).
Id. at -, 117 S.Ct. at 2082.
As we pointed out in Artway, the Supreme Court had previously required this degree of deference only in cases where the issue before it was “whether a proceeding is effectively criminal so that the procedural protections of the Fifth and Sixth Amendments must apply” in that proceeding. Artway, 81 F.3d at 1262 n. 26. After Hendricks, however, it seems clear that similar deference to the legislative judgment is required whenever legislative measures are challenged on the basis of the Ex Post Facto and Double Jeopardy Clauses.[15] While the Hendricks Court did characterize Hendricks’ claim at one point as an “argument ... that the Act establishes criminal proceedings,” — U.S. at -, 117 S.Ct. at 2081, the issue before the Court was whether the Act imposed “punishment” for purposes of the Ex Post Facto and Double Jeopardy Clauses, and the Court’s holding was that the Act did not.
Accordingly, in Artway terms, if we determine that the actual legislative purpose was remedial, we must sustain Megan’s Law against the current challenges unless its objective purpose or its effect are sufficiently punitive to overcome a presumption favoring the legislative judgment.
C. Legislative Purpose
As we have indicated, in Artway we addressed only whether Tier 1 registrants under Megan’s Law are subjected to punishment — that is, whether being required to register, and having the resulting disclosures available to law enforcement personnel, constitute punishment. In that context, we determined “whether the legislature’s actual purpose [when enacting Megan’s Law] was to punish.” Artway, 81 F.3d at 1264. Looking to the statute’s own statement of purpose[16] *1097 and the scant legislative history,[17] we found that the legislative purpose of Megan’s Law was to identify potential recidivists and alert the public when necessary for the public safety, and to help prevent and promptly resolve incidents involving sexual abuse and missing persons. We then noted that “[protecting the public and preventing crimes are the types of purposes [the Supreme Court has] found ‘regulatory’ and not punitive.” Id,.; see also De Veau, 363 U.S. at 160, 80 S.Ct. at 1154-55. We therefore concluded that the restrictive provisions of Megan’s Law passed the “actual purpose” test.
Since in Artway we were only dealing with a challenge to registration, we were not required to definitively resolve the legal question of the actual purpose of notification.[18] However, the record evidence of legislative intent is exactly the same for both registration and notification. Nothing has been called to our attention that causes us to change the conclusion we reached in Artway regarding this evidence. While the appellants view the context in which Megan’s Law was enacted as indicative of a punitive intent, wefind it entirely consistent with its declared remedial purpose. Accordingly, we have no basis for questioning the legislature’s declared purpose, which is remedial and devoid of any indication of an intent to punish. We must give substantial deference to that judgment.
D. Objective Purpose
In Artway, we concluded that registration and Tier 1 notification of law enforcement personnel was fully explained by the nonpunitive, legislative purpose. We explained:
Here, the solely remedial purpose of helping law enforcement agencies keep tabs on these offenders fully explains requiring certain sex offenders to register. Registration may allow officers to prevent future crimes by intervening in dangerous situations .... [T]he registrant may face some unpleasantness from having to register and update his registration, b]ut the remedial purpose of knowing the whereabouts of sex offenders fully explains the registration provision____ And the means chosen — registration and law enforcement notification only — is not excessive in any way. Registration, therefore, is certainly “reasonably related” to a legitimate goal: allowing law enforcement to stay vigilant against possible re-abuse.
81 F.3d at 1265.
The issue now before us is whether the provisions of Megan’s Law that call for dissemination of information about registrants beyond law enforcement personnel are also fully explained by the nonpunitive, legislative purpose. In addressing this issue, there is a lesson in the above quoted portion of Artway that we must keep in mind. The relevant issue is whether these provisions are “ ‘reasonably related’ to a legitimate goal.” *1098 Nothing in Artway or the Supreme Court cases upon which it relies requires a perfect fit between end and means. Nor does anything in Ursery or Hendricks. An absence of remedial, objective purpose is not demonstrated by pointing out that the legislature did not address what might be perceived as another aspect of the same problem or that there may be a means of serving the legislative end that would be more effective than the means chosen. If a reasonable legislator motivated solely by the declared remedial goals could have believed the means chosen were justified by those goals, then an objective observer would have no basis for perceiving a punitive purpose in the adoption of those means.
We conclude that the Tier 2 and 3 dissemination of information beyond law enforcement personnel is reasonably related to the nonpunitive goals of Megan’s Law. As we have already indicated, these goals include identifying potential recidivists, notifying those who are likely to interact with such recidivists to the extent necessary to protect public safety, and helping prevent future incidents of sexual abuse. The fundamental premise of Megan’s Law is that registration and carefully tailored notification can enable law enforcement and those likely to encounter a sex offender to be aware of a potential danger and “to stay vigilant against possible re-abuse.” Id. This is not an unreasonable premise.
Moreover, these goals have not been pursued in a way that has imposed a burden on registrants that clearly exceeds the burden inherent in accomplishment of the goals. The statutory scheme is a measured response to the identified problem that does not subject all registrants to dissemination of information beyond law enforcement personnel. The Guidelines call for a risk assessment based on objective criteria, all of which might reasonably be perceived as relevant to the degree of risk presented by each registrant. This risk assessment is utilized to determine the maximum scope of the notification concerning the registrant. In the ease of Tier 1 registrants, who comprise over 45% of those required to register, dissemination is limited to law enforcement personnel. In the case of the moderate risk registrants in Tier 2, who comprise 50% of those evaluated, dissemination is limited to those in the community who have responsibility for, or provide support to, those who are most likely to be victimized if the registrant recidivates. Even with respect to the 5% of registrants determined to pose higher risk, there is no unlimited public dissemination. Under the Guidelines, information is disseminated only to those who are “reasonably certain” to encounter the registrant.
Appellants nevertheless insist that the remedial goal of Megan’s Law does not fully justify the means selected. First, they point to the fact that risk assessment under the Guidelines is based primarily on the registrant’s past behavior. Past criminal conduct is the basis for 90 of the possible 111 points in the Registrant Risk Assessment Scale. Id. at 1266 n. 30. According to appellants, this Scale fails to take sufficient account of treatment or other positive changes in a registrant’s life. They conclude that “the reach of this law will necessarily be excessive, encompassing those who do not actually pose a genuine risk of reoffense.” Appellants’ Br. at 41. However, the non-existence of a perfect predictor of recidivism should not preclude legislative resort to a rationally based instrument of risk assessment, developed and validated by mental health professionals. The most appellants have done is to suggest that a more effective predictor might be devised; that is not enough to make the objective purpose of the predictor adopted a punitive one.[19]
Appellants further suggest that the information disseminated is often excessive in light of the stated remedial aims. The information disseminated with respect to a Tier 2 or Tier 3 registrant includes his or her name, description, recent photograph, address, place of employment or schooling, and a description of any vehicle used by him or her along with its license number. Appellants *1099 point out that some of this information will sometimes be unnecessary. “[F]or example, if the registrant works 20 or 30 miles from his home, the registrant’s neighbor who receives notification is not ‘likely to encounter’ the registrant at his place of employment. Likewise, those who live near the same registrant’s place of employment are not ‘likely to encounter’ the registrant at his home. Yet in both instances, notification includes the same information____” Id.
We are not persuaded. First, information that an offender does not spend all of his time in the vicinity, but does have a residence or a place of employment/school elsewhere, may indeed serve a remedial purpose in helping individuals know when it is that they are “likely to encounter” the offender. Moreover, even if this were not so, a decision not to expend the resources necessary to tailor each notice to the circumstances of the person receiving notice is hardly inconsistent with good faith pursuit of the declared remedial purposes.
Having found a reasonable “fit” between end and means, we turn to historical precedent. To appellants, the dissemination of information beyond law enforcement personnel is closely analogous to the well-recognized historical punishments of public shaming, humiliation and banishment as those practices were employed in colonial times. We rejected a very similar argument in United States v. Criden, 648 F.2d 814 (3d Cir.1981). There, the district court had denied the media the right to copy, for rebroadcast, video and audio tapes admitted into evidence and played to the jury during a criminal trial. In support of its decision to foreclose post-trial dissemination of public record information to the public, the district court made the following observation:
The greater and more widespread the publicity about a particular criminal case, the more likely it is that penalties not prescribed by the law will be visited upon the accused and, more importantly, upon innocent relatives and friends____
Given the nature of our society these side effects are inevitable; indeed, it can be argued that they form an important, if unofficial, part of the sanctions imposed by society upon lawbreakers. The unfortunate fact is, however, that these side effects are not uniformly visited upon persons accused of violating the law. And, since they are not an official part of the criminal justice process, and are beyond the reach of that process, there is probably no acceptable way of ensuring uniformity of application.
Id. 648 F.2d at 824 (quoting United States v. Criden, 501 F.Supp. 854, 860 (E.D.Pa.1980)). In pursuing this theme, the district court likened the proposed rebroadcast tc placing the defendant in public stocks.
We rejected the tendered analogy:
Nor can we accept the [district] court’s strained analogy of rebroadcast to “parading a convicted defendant through the streets, or holding him up to public ridicule by exhibiting him in a cage or in the stocks.” 501 F.Supp. at 860.
Id. 648 F.2d at 825. Nor can we accept the suggested analogy between notification’s republication of information publicly available at the time of a sex offender’s trial and the holding of a convicted defendant up to public ridicule. Public shaming, humiliation and banishment all involve more than the dissemination of information. State dissemination of information about a crime and its perpetrators was unnecessary in colonial times because all in the colonial settlement would have knowledge of these matters. Rather, these colonial practices inflicted punishment because they either physically held the person up before his or her fellow citizens for shaming or physically removed him or her from the community.
The “sting” of Megan’s Law for Tier 2 and 3 registrants results not from their being publicly displayed for ridicule and shaming but rather from the dissemination of accurate public record information about their past criminal activities and a risk assessment by responsible public agencies based on that information. This distinction makes a substantial difference when one looks for the relevant historical understanding of our society. Dissemination of information about criminal activity has always held the potential for substantial negative consequences for those involved in that activity. Dissemina *1100 tion of such information in and of itself, however, has never been regarded as punishment when done in furtherance of a legitimate governmental interest.
When there is probable cause to believe that someone has committed a crime, our law has always insisted on public indictment, public trial, and public imposition of sentence, all of which necessarily entail public dissemination of information about the alleged activities of the accused. As this court has explained, we insist upon this public dissemination for a number of reasons: It “heightens public respect for the judicial process,” it “permits the public to ... serve as a check upon the judicial process,” and it “plays an important role in the ... free discussion of governmental affairs.” Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir.1984) (internal quotation marks omitted). Wholly independent of the criminal sanctions that conviction may entail, the consequences of our law requiring this public dissemination of information can be severe. In every case, a conviction becomes a matter of public record, and in many cases that conviction may receive widespread media attention. Depending upon the crime and the circumstances, information disseminated as a result of our insistence on public prosecution may be the source of a wide range of adverse consequences for the eonvicted defendant, running from mild personal embarrassment to social ostracism and/or vigilante retribution. Employment may be lost, and the opportunity for future employment may be dramatically reduced. It may take a lifetime of effort on the part of a convicted defendant to restore previously existing relationships with those with whom he deals personally, and restoration of his reputation among others may never occur. Nevertheless, our laws’ insistence that information regarding criminal proceedings be publicly disseminated is not intended as punishment and has never been regarded as such.
We believe the required dissemination of information generated by our criminal justice system and the subsequent dissemination of “rap sheet” information to regulatory agencies, bar associations, prospective employers and interested members of the public[20] constitute far more compelling analogies than the stocks, cages, and scarlet letters referenced by appellants.[21]
We also agree with appellees that various forms of state warnings about threats to public safety provide more apt analogies to Tier 2 and Tier 3 notification than the referenced colonial practices. In order to provide members of the public with an opportu *1101 nity to take steps to protect themselves, the government has traditionally published appropriate warnings about a range of public hazards. Posters warning that a pictured individual is abroad in the community and to be regarded as armed and dangerous come most readily to mind. But there are others as well. The state has traditionally, for example, posted quarantine notices when public health is endangered by individuals with infectious diseases. Cf. Hendricks, at -, 117 S.Ct. at 2084 (“A State could hardly be seen as furthering a’punitive’ purpose by [isolating] persons inflicted with a[ ] highly contagious disease.”).[22] Significantly, these warnings communicate not only facts about past events but also the fact that a public agency has found a significant future risk based on those events.
Whenever these state notices are directed to a risk posed by individuals in the community, those individuals can expect to experience embarrassment and isolation. Nevertheless, it is generally recognized that the state has a right to issue such warnings and the negative effects are not regarded as punishment. Because the closest analogies have not historically been regarded as punishment, we conclude that historical precedent does not demonstrate an objective punitive purpose.
Finally, we turn to the third consideration involved in assessing objective purpose. That consideration, as we understand it, is a savings provision — that is, even if the remedial purpose of a measure cannot fairly be said to justify all of its aspects, it will nevertheless be found nonpunitive if measures of this type, like taxes, have traditionally served both remedial and deterrent purposes and the particular measure before the court serves such purposes in a manner consistent with its analogous antecedents. Having concluded that the remedial purpose of Megan’s Law justifies all of its aspects, it necessarily follows in this ease, as it did in Artway, 81 F.3d at 1266, that this third consideration does not counsel in favor of a finding that it is punitive.
E. Effects
As we have indicated, we hypothesized in Artway that “a law [could] constitute unconstitutional ‘punishment’ because of its effects” even where no actual or objective punitive purpose is shown. 81 F.3d at 1260. We explained:
[An] examination of effects, like the Austin [v. United States, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993),] inquiry into history, is necessary to limit what would otherwise be the untenable results of the De Veau subjective purpose inquiry and the Helper means-end calculus. While even a substantial “sting” will not render a measure “punishment,” ... at some level the “sting” will be so sharp that it can only be considered punishment regardless of the legislators’ subjective thoughts.
Id. 81 F.3d at 1261.
It is clear from Artway, however, that for the effects of a measure to render it “punishment,” those effects must be extremely onerous. Even deprivation of one’s livelihood is not sufficiently onerous. Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (termination of social security benefits); Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revocation of license to practice one’s profession). Moreover, while Artway’s third prong serves as an independent hurdle that a legislative measure must surmount, when it is applied, the burden imposed must still be evaluated in the light of the importance of any legitimate governmental interest served. The only examples the ease law suggests of effects sufficiently onerous are deprivation of one’s United States citizenship that leaves one a “stateless person” and a complete deprivation of personal freedom (i.e., incarceration). Even these deprivations are not per se punishment, however. While in some circumstances making one a “stateless person” is punishment, denaturalization as a remedy for citizenship fraudulently obtained is regarded not as punishment but as *1102 a necessary part of regulating naturalization of aliens. See Trop, 356 U.S. at 98, 78 S.Ct. at 596-97. Even incarceration is not always punishment. Pre-trial detention and post-sentence civil commitment of dangerous offenders have both been expressly found to be nonpunitive measures when justified by important state interests. See United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); Hendricks, at -, 117 S.Ct. at 2072.
The direct effects of Megan’s Law clearly do not rise to the level of extremely onerous burdens that sting so severely as to compel a conclusion of punishment. All Megan’s Law mandates is registration and notification. Under Megan’s Law, New Jersey has not deprived appellants of their freedom or their citizenship. The state has imposed no restrictions on a registrant’s ability to live and work in a community, to move from place to place, to obtain a professional license or to secure governmental benefits.
What concerns registrants, however, are the indirect effects: Actions that members of the community may take as a result of learning of the registrant’s past, his potential danger, and his presence in the community. People interact with others based on the information they have about them. Knowing that someone is a convicted sex offender and has been evaluated as a continuing risk is likely to affect how most people treat that person.
There can be no doubt that the indirect effects of Tier 2 and Tier 3 notification on the registrants involved and their families are harsh. The record documents that registrants and their families have experienced profound humiliation and isolation as a result of the reaction of those notified. Employment and employment opportunities have been jeopardized or lost. Housing and housing opportunities have suffered a similar fate. Family and other personal relationships have been destroyed or severely strained. Retribution has been visited by private, unlawful violence and threats and, while such incidents of “vigilante justice” are not common, they happen with sufficient frequency and publicity that registrants justifiably live in fear of them. It also must be noted that these indirect effects are not short lived. While there are suggestions in the record that the circumstances of a registrant may stabilize as time passes after notification, the statute permits repeat notification over a period of many years.
The primary sting from Megan’s Law notification comes by way of injury to what is denoted in constitutional parlance as reputational interests. This includes the burdens of isolation, harassment, loss of opportunities, and the myriad of more subtle ways in which one is treated differently by virtue of being known as a potentially dangerous sex offender. The other type of indirect effect is exposure to an increased risk of private violence that can result in damage to one’s property or injury to one’s person. We will focus on each class of indirect effects in turn.
Injury to reputation has traditionally been regarded in our society as a serious matter. Our law of defamation has from our earliest days protected reputation and provided compensation for wrongful injury to reputational interests. It has provided recourse, for example, for those whose reputations are injured by false allegations of criminal activity. At the same time, however, reputational interests have not been accorded the same level of protection in our society as interests that have been found “implicit in the concept of ordered liberty.” Paul v. Davis, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976).
In Paul v. Davis, law enforcement officials decided to alert local area merchants to possible shoplifters who might be operating during the Christmas season. They distributed a “flyer” to 800 merchants which contained the name and “mug shot” photo of individuals described as “Active Shoplifters.” Davis, who had previously been arrested for — but never convicted of — shoplifting was included.
Davis brought a civil rights action against the law enforcement officials arguing that, by destroying his reputation in the community, they had violated his “right to privacy guaranteed by the First, Fourth, Fifth, Ninth, and Fourteenth Amendments.” Id. at 712, 96 S.Ct. at 1166. Though acknowledging that the Constitution secures a right to per *1103 sonal privacy, the Supreme Court rejected the notion that Davis’ interest in his reputation was sufficiently fundamental to come within that constitutional right. The Court observed:
In Roe [v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)], the Court pointed out that the personal rights found in this guarantee of personal privacy must be limited to those which are “fundamental” or “implicit in the concept of ordered liberty” as described in Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). The activities detailed as being within this definition were ones very different from that for which respondent claims constitutional protection — matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. In these areas it has been held that there are limitations on the States’ power to substantively regulate conduct.
Respondent’s claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State’s ability to restrict his freedom of action in a sphere contended to be “private,” but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.
Id. at 713, 96 S.Ct. at 1166.
The indirect effects experienced by Tier 2 and Tier 3 registrants, while quite likely more profound than those complained of by Davis, are clearly of a similar nature. Just as Davis sought constitutional protection from the consequences of state disclosure of the fact of his shoplifting arrest and law enforcement’s assessment that he was a eon-timing risk, so registrants seek protection from what may follow disclosure of facts related to their sex offense convictions and the resulting judgment of the state that they are a continuing risk. It follows that, just as the officers’ publication of the official act of Davis’ arrest did not violate any fundamental privacy right of Davis’, neither does New Jersey’s publication (through notification) of registrants’ convictions and findings of dangerousness implicate any interest of fundamental constitutional magnitude. The reputational interests asserted by appellants are “very different” from matters relating to marriage, procreation, and child rearing, and are therefore “far afield” from what has been deemed “fundamental” by the Constitution.[23]
Hendricks, and the long line of cases on which it relies, counsels that bona fide remedial legislation may inflict very substantial individual hardship without implicating the Ex Post Facto and Double Jeopardy Clauses. It necessarily follows that some limit must be placed on the situations in which a measure’s sting alone, despite its remedial purpose and effect, will constitute punishment under those clauses and that classification as punishment on the basis of sting alone must be reserved for cases involving deprivation of the interests most highly valued in our constitutional republic. “[F]reedom from physical restraint ‘has always been at the core of the liberty protected’ ” by the Constitution. Hendricks, at -, 117 S.Ct. at 2079 (quoting Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992)). Freedom of thought and expression and freedom from state interference with the privacy interests identified in Davis are similarly “implicit in our concept of ordered liberty.” Davis, 424 U.S. at 713, 96 S.Ct. at 1166. Interests such as these are sufficiently fundamental to our constitutionally secured liberty that state interference with them can be justified only by the most important of state interests.[24] Davis *1104 establishes that reputational interests are not among these fundamental liberty interests.
We believe the state’s interest in protecting the public here is similar to, and as compelling as, the state interest served by the civil commitment statute in Hendricks. Accordingly, based on Hendricks, we believe that the state’s interest here would suffice to justify the deprivation even if a fundamental right of the registrant’s were implicated. Given that something less than a fundamental interest is implicated, the impact of Megan’s Law on the registrants’ reputational interests is necessarily insufficient alone to constitute “punishment.”
We now turn to the second type of indirect effects arising from notification. As we earlier observed, the record bears evidence of retributive assaults on registrants by private individuals. There is also evidence of vandalism and other damage to property of registrants and their associates. As we have also noted, however, each notification is accompanied by a warning against misuse of the information conveyed and an assurance that any private violence will be prosecuted. This is thus not a situation in which the state has encouraged private violence. Nor is it a situation in which the state has in some way incapacitated a person from taking steps to protect him-or herself against private violence or has deprived a citizen of the law enforcement protection accorded to others in the population generally. On the contrary, the state has taken affirmative steps to discourage private violence in response to notification, and is providing registrants with the law enforcement protection available to others.
We agree with the district court that the risk of private violence stems primarily from a registrant’s past criminal activity. The most that can be said about notification is that the state, by disseminating accurate information about a registrant’s crime and its assessment of future risk, may materially extend the period during which the increased risk of private violence may exist. While the extension of that increased risk is understandably of concern to plaintiffs, they have not persuaded us that the magnitude of the risk is such as to require classification of its extension as punishment. Although the record reflects that personal injury and property damage from private violence has occurred, it also reflects that these occurrences are relatively rare. Of the 135 notifications completed in New Jersey for which there is record data, only two occasioned assaults or property damage deemed serious enough by the victim-registrant to warrant a report to law enforcement authorities. Even if we were prepared to broaden our consideration to include examples of physical harm to registrants not reported to police, this would increase the total number of record cases to just three. Our record with respect to Washington and Oregon also evidences that reported instances of personal injury or property damage are rare.[25]
As we view this matter, there is unfortunately a background risk of private violence that is necessarily assumed by everyone in our society. When one commits a reprehensible crime and is publicly prosecuted, that risk is undoubtedly augmented to a limited degree. The duration of that degree of augmented risk is likely to be extended by notification pursuant to Megan’s Law and this is understandably a concern for registrants. *1105 Nevertheless, we believe the Supreme Court would not regard this indirect effect of Megan’s Law as sufficiently burdensome to require classification of the law as punitive. Certainly, in terms of the impact on the everyday lives of registrants, the burden of this aspect of Megan’s Law pales by comparison to the civil commitment of sex offenders sanctioned in Hendricks.
F. Satisfaction Of The Artway Test
Because Megan’s Law satisfies each of the three elements of the Artway test, we hold that the notification required by Megan’s Law does not constitute punishment for purposes of the Ex Post Facto and Double Jeopardy Clauses.
VI. THE PROCEDURAL DUE PROCESS ISSUES
A. Deprivation Of A Liberty Interest
The Fourteenth Amendment of the United States Constitution provides that “no person shall be deprived of life, liberty, or property without due process of law.” U.S. Const. Amend. XIV. Appellants insist that they have a liberty interest that entitles them to the protection of procedural due process under this provision. Appellees insist that there is no such interest.
Liberty interests that trigger procedural due process may be created by state law or by the federal constitution itself. See Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). We need not reach the issue of whether appellants have a liberty interest recognized by the federal constitution because we are satisfied that appellants have a liberty interest created by the New Jersey Constitution of which they cannot be deprived without being accorded the process due under the Fourteenth Amendment.
If a state law requires that the freedom of a person on parole or probation cannot be taken away without cause, the state has ereated a liberty interest that cannot be taken away without the process due under the Fourteenth Amendment. See Gagnon v. Scarpelli, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Similarly here, we know from Doe that the New Jersey Constitution gives Tier 2 and Tier 3 registrants the right to be free from Tier 2 and Tier 3 notification absent a showing of an overriding state interest. The New Jersey Supreme Court there held not only that Tier 2 and Tier 3 registrants had a right to the procedural due process guaranteed by the New Jersey Constitution, but also that they had a substantive right under that Constitution to be free of the disclosures required by Megan’s Law, absent a demonstration that such disclosures are required by a legitimate and substantial state interest.[26] As the court explained:
With its declaration of the right to life, liberty, and the pursuit of happiness, Article I, § 1 of the New Jersey Constitution encompasses the right of privacy.... We have found a constitutional right of privacy in many contexts, including the disclosure of confidential or personal information. Hennessey v. Coastal Eagle Point Oil Co., 129 N.J. 81, 96, 609 A.2d 11 (1992) (citing In re Martin, 90 N.J. 295, 447 A.2d 1290 (1982)).
In resolving conflicts between the government’s need for information and the individual’s right of confidentiality, this Court has adopted a balancing test similar to that adopted by the federal courts. Martin, supra, 90 N.J. at 318, 447 A.2d 1290. We concluded, in Martin, that “ ‘even if the governmental purpose is legitimate and substantial ... the invasion of the fundamental right of privacy must be minimized by utilizing the narrowest means which can be designed to achieve the public purpose.’ ” Ibid. (quoting Lehrhaupt v. Flynn, 140 N.J.Super. 250, *1106 262, 264, 356 A.2d 35 (App.Div.1976), aff'd o.b., 75 N.J. 459, 383 A.2d 428 (1978))....
662 A.2d at 412.[27]
B. Standards For Determining The Process Due
Having concluded that Tier 2 and Tier 3 registrants are entitled to due process under the Fourteenth Amendment of the federal Constitution, we turn to the issue of what process is due them. Appellants contend that two procedural protections are due that are absent from the Megan’s Law scheme. They insist that due process requires both that the burden of persuasion at a Megan’s Law hearing be on the state rather than the registrant, and that the state’s burden at such a hearing be to demonstrate the propriety of the tier classification and the notification plan by clear and convincing evidence.[28]
Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), provides the framework we must apply to analyze both the burden of persuasion claim — whether it is the state or the registrant who must persuade the court on the material points — and the standard of proof claim — whether, if the burden of persuasion is on the state, the state must prove its ease by a preponderance or by clear and convincing evidence. As Mathews teaches;
[D]ue process is flexible and calls for such procedural protections as the particular situation demands. Morrissey v. Brewer, *1107 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)....
More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that mil be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Mathews, 424 U.S. at 334-35, 96 S.Ct. at 903.
The Supreme Court has twice applied the Mathews test in the specific context of a challenge to the preponderance of evidence standard of proof. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), posed the issue of whether due process requires the state to prove its case in a termination of parental rights proceeding by clear and convincing evidence, rather than merely by a preponderance of evidence. Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), presented the issue of the state’s burden in a civil commitment proceeding. In each instance, the Court, in addition to identifying the private and public interests at stake and evaluating the relative risk of error in the particular kinds of proceedings involved, addressed whether the standard employed “fairly allocates the risk of an erroneous factfinding between the[ ] parties.” Santosky, 455 U.S. at 761, 102 S.Ct. at 1399. As the Santosky Court explained:
Addington teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.
Id. at 755, 102 S.Ct. at 1395.
In both Santosky and Addington, the Court held that due process required the state to carry the burden of persuasion by more than a preponderance of the evidence, since the preponderance standard requires litigants to “share the risk of error in roughly equal fashion.” Addington, 441 U.S. at 423, 99 S.Ct. at 1808. Neither a person threatened with a termination of parental rights nor one standing in jeopardy of a civil commitment “should ... be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.” Id. at 427, 99 S.Ct. at 1810.
C. Allocation Of The Burden Of Persuasion
We first address whether the Due Process Clause permits New Jersey to allocate the burden of persuasion in a Megan’s Law proceeding to the registrant. We begin, as Mathews directs, by identifying the private and public interests involved. The private interests that will be affected by the state’s notification in Tier 2 and Tier 3 cases if the outcome of the hearing is in the state’s favor are very substantial. Notification puts the registrant’s livelihood, domestic tranquility, and personal relationships with all around him in grave jeopardy. This jeopardy will not only extend to virtually every aspect of the registrant’s everyday life, it will also last at least 15 years. As the New Jersey Supreme Court recognized in Doe, a registrant thus has a compelling interest in an accurate and reasonable disposition of the issues before the court in a Megan’s Law hearing.
The state, on the other hand, has a compelling interest in protecting its citizens by giving prompt notification to potential victims and relevant caregivers with respect to registrants who are accurately determined to be Tier 2 or Tier 3 risks. New Jersey thus has a compelling interest in having an expedited, summary process. However, the state also has an interest in ensuring that its classification and notification system is both fair and accurate. Put conversely, the state has no substantial interest in notifying persons who will not come into contact with the registrant; nor has it any interest in notifying those who will come into contact with a registrant who *1108 has erroneously been identified as a moderate or high risk. Cf. Santosky, 455 U.S. at 766, 102 S.Ct. at 1401-02 (noting that even when the state seeks to terminate parental rights, it shares an interest with the parents in an accurate factfinding as to their fitness).
Given the respective private and public interests at stake in a Megan’s Law hearing, we conclude that the burden of persuasion must be placed on the state if, compared to proceedings in which that burden is on the registrant, the risk of error will be materially reduced without materially impairing the state’s ability to secure a prompt determination and without imposing substantial new administrative burdens on the state.
Our next step, then, is to identify the issues that are before the court in a Megan’s Law hearing — a necessary predicate for assessing any potential reduction in the risk of error. When a challenge is mounted to a tier classification, the issues for resolution by the court are limited to: (1) whether the Scale has been accurately applied to the facts of the case in accordance with its terms; and (2) whether there is something extraordinary about the particular registrant’s case that takes it out of the “heartland” of the eases within the scope of the tier that would otherwise be indicated. In re G.B., 685 A.2d at 1264. If the registrant challenges not just the tier classification but also the reasonableness of the prosecutor’s notification plan, the court must also exercise a judgment about whether the scope of the proposed notification is appropriate to the risk presented by the particular registrant.
Since the validity of the Scale as a risk assessor must be accepted by the court, resolution of the first issue primarily requires factfinding — albeit factfinding in a context that poses more than a normal risk of error, as we explain hereafter. Resolution of a registrant’s contention that his case is outside the “heartland” or that the notification proposed is excessive, on the other hand, necessarily involves a subjective judgment by the court regarding the degree and nature of the risk posed by the particular registrant. Thus, in resolving these issues, the court is necessarily required to assess future dangerousness. While a state is clearly entitled to require a court to undertake such an assessment, it is an undertaking involving substantial uncertainty. See Randy K. Otto, On the Ability of Mental Health Professionals to “Predict Dangerousness": A Commentary on Interpretation of the “Dangerousness” Literature, 18 Law & Psychol. Rev. 43, 45, 62-63 (1994) (noting that researchers in the 1970s began compiling data showing that the presumption that professionals could predict violent behavior was incorrect, but also noting that recent data showed “some” predictive ability); American Psychiatric Association, Report of the American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual 20 (1974) (concluding that “[njeither psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness”).
Resolution of factual issues made relevant by the Scale is of critical importance to the outcome at a Megan’s Law hearing. These issues include the circumstances of the crime that has required registration as well as other criminal conduct in which the registrant has allegedly engaged. See, e.g., In re C.A., 679 A.2d at 1153. In every hearing, the court will be called upon to find facts relating to the circumstances of a sex offense of which the registrant has been convicted. Many of these facts will not have been determined by the trier of fact in the criminal proceeding. Since a prosecutor may also rely on conduct for which the registrant has not been convicted, the court will be called upon in some proceedings to determine the circumstances of sex offenses that have never been the subject of a criminal proceeding. Sex offenses are almost always committed in private. This means that potential witnesses with relevant knowledge of whether, and if so how, an alleged sex offense occurred are generally limited to the victim and the alleged offender. One can therefore confidently predict that there will frequently be issues of importance in Megan’s Law hearings where the information available to the court will be limited to the victim’s word against the word of the alleged offender.
These issues must be resolved in a proceeding in which the rules of evidence do not apply. The prosecutor may base her case *1109 entirely on hearsay, if it shows indicia of reliability. Most importantly, these issues must be resolved in a proceeding in which the registrant cannot compel testimony from the victim without the approval of the court, and the court must follow the following admonition of the New Jersey Supreme Court:
The trial courts should only seek to compel such testimony when there is a real need for the testimony that cannot be met in an alternative manner. We expect that only in the rarest of cases will a court compel the testimony of a victim. In those cases, we suggest that, when possible, the trial court itself conduct all questioning of the victim.
Id., at 1166.
Accurate factfinding is also made more difficult by the timetable on which the proceedings must be conducted. Because of the public interest in a prompt resolution of the issues posed in any such proceeding, the Supreme Court of New Jersey has ordered that the time from the date of notice to a registrant until the time of trial court decision on the tier classification should not exceed 40 to 45 days. See Supreme Court of New Jersey, Outline of Procedure for Hearings on Objections to Megan’s Law Tier 2 and Tier 3 Classification and Manner of Notification Determinations ¶ I. While clearly justified, this requirement does substantially constrict both sides in their preparations for the truthseeking hearing process.
Courts are human institutions and there is, of course, risk of error in every judicial proceeding. Given the nature of the issues typically presented in a Megan’s Law hearing and the process established by New Jersey for resolving them, however, we believe the risk of error in such a hearing is substantially greater than that in a typical civil damage suit. We further conclude that, in this context, the allocation of the burden of persuasion is of critical importance and the assignment of that burden to the prosecutor will substantially reduce the risk of an erroneous outcome.
When the court in a Megan’s Law hearing simply cannot tell which of two conflicting accounts (regarding the use of force, perhaps) represents the historical truth, allocation of the burden of persuasion is likely to be outcome determinative. The same is true in those eases in which the trier of fact finds inconsistencies or implausible elements in the victim’s account, but, at the same time, is inclined to discount the registrant’s account because of his criminal history or the enormity of his stake in the outcome. In these cases, as well as others in which the trier of fact discounts the account of the registrant for similar reasons, requiring the prosecutor to affirmatively convince the court of the important facts can be expected to materially reduce the risk of error.
Finally, we must consider whether an allocation of the burden of persuasion to the state would materially impair the state’s ability to receive a prompt determination or would impose new administrative burdens on it. Under the current procedural scheme, the state has the burden of presenting a prima facie case. This means, of course, that the prosecutor is already required to marshal and tender evidence that, if believed, will establish the facts she relied upon. While allocation of the burden of persuasion to the state may motivate the prosecutor to utilize live testimony rather than affidavits where substantial credibility issues are anticipated, this would not appear to impose a substantial administrative burden. Moreover, we perceive no reason to predict that any possible increase in the utilization of live witnesses would materially impair the prosecutor’s ability to meet her responsibility under New Jersey’s 45 day timetable for Megan’s Law determinations.
Given (1) the interest of the registrant and the state in an accurate determination of the relevant issues of fact in a Megan’s Law hearing, (2) the absence of a substantial economic or other burden to the state from allocating the burden of persuasion to it, and (3) our conclusion that such an allocation will materially reduce the risk of error in those cases in which the allocation of that burden plays a role, we hold that due process requires that the prosecutor shoulder the burden of persuading the court of the truth of the facts upon which she has relied.
*1110 D. Extent Of The State’s Evidentiary Burden
The remaining issue is whether due process requires that the prosecutor prove her facts by clear and convincing evidence, as appellants claim, rather than merely by a preponderance of evidence. Santosky and Addington require that we address whether, in light of the relative importance of the private and public interests at stake and the impact on those interests of an erroneous determination, the preponderance of evidence standard fairly allocates the risk of error between the parties. This requires “a very fundamental assessment of the comparative social costs of erroneous factual determinations” in the context of Megan’s Law proceedings. In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). Based on such an assessment, we must determine whether registrants can fairly “be asked to share equally with society the risk of error.” Addington, 441 U.S. at 427, 99 S.Ct. at 1809.
We have previously identified the private and public interests at stake in a Megan’s Law proceeding. For present purposes, it is important to add that the impact of an erroneous determination on those interests is significantly dissimilar. An erroneous underestimation of an individual’s dangerousness will not necessarily result in harm to protected groups. Registration alone, which Megan’s Law mandates regardless of an offender’s classification, allows law enforcement officials to monitor offenders and provides considerable disincentive to offenders to commit criminal acts because of the high likelihood of being apprehended. On the other hand, an overestimation of an individual’s dangerousness will lead to immediate and irreparable harm to the offender: his conviction becomes public, he is officially recorded as being a danger to the community, and the veil of relative anonymity behind which he might have existed disappears.
In this context, we find Addington to be the most helpful authority. The civil commitment statute involved there required the court to determine, inter alia, whether “hospitalization [of the individual who was the subject of the proceeding] in a mental hospital [was required] for his own welfare and protection or the protection of others.” Id. at 420, 99 S.Ct. at 1806. Thus, there, as here, the trier of fact was required to predict future dangerousness. Moreover, the interests which the state had in civil commitment proceedings under the statute were similar to the interests of the state here — protecting the public from violence — and the risks attending an erroneous finding against the state are, therefore, similar. Additionally, registrants share with individuals facing civil commitment an important interest that was stressed in Addington. As the Court explained:
[I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena “stigma” or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.
Id. at 425-26, 99 S.Ct. at 1809.
It is true, as the state points out, that a registrant in a Megan’s Law proceeding does not face the same restrictions on his physical freedom that a potential committee faces in civil commitment proceedings. It is clear from Santosky, however, that due process requires a clear and convincing standard even in the absence of a threat of physical restraint when the “loss threatened by [the] particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder.” Santosky, 455 U.S. at 758, 102 S.Ct. at 1397. As the Court observed in Santosky:
This Court has mandated an intermediate standard of proof — “clear and convincing evidence” — when the individual interests at stake in a state proceeding are both “particularly important” and “more substantial than mere loss of money.” Addington v. Texas, 441 U.S. at 424, 99 S.Ct. at 1808. Notwithstanding “the state’s ‘civil labels and good intentions,’ ” id. at 427, 99 S.Ct. at 1810, quoting In re Winship, 397 U.S. at 365-66, 90 S.Ct. at 1073-74, the Court has deemed this level of certainty necessary to *1111 preserve fundamental fairness in a variety of government initiated proceedings that threaten the individual involved with “a significant deprivation of liberty’’ or “stigma.” 441 U.S. at 426, 99 S.Ct. at 1809. See, e.g., Addington v. Texas, supra (civil commitment); Woodby v. INS, 385 U.S. at 285, 87 S.Ct. at 487-88 (deportation); Chaunt v. United States, 364 U.S. 350, 353, 81 S.Ct. 147, 149-50, 5 L.Ed.2d 120 (1960) (denaturalization); Schneiderman v. United States, 320 U.S. 118, 125, 159, 63 S.Ct. 1333, 1336-37, 1353, 87 L.Ed. 1796 (1943) (denaturalization).
Santosky, 455 U.S. at 756, 102 S.Ct. at 1396.
We must, therefore, ask whether the preponderance of evidence standard, which “allocates the risk of error nearly equally” between an erroneous overestimation or underestimation of a registrant’s future dangerousness, “refleet[s] properly the [ ] relative severity” of these erroneous outcomes. Id. at 766, 102 S.Ct. at 1401. Addington supplies the answer. Because “the possible injury to the individual [registrant] is significantly greater than any possible harm to the state,” the registrant, consistent with due process, cannot “be asked to share equally with society the risk of error.” 441 U.S. at 427, 99 S.Ct. at 1809. It necessarily follows that the Due Process Clause requires that the state prove its case by clear and convincing evidence in a Megan’s Law proceeding.
In reaching this conclusion, we have not been unmindful of the Supreme Court’s decision in McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986). In McMillan, a Pennsylvania sentencing statute set a mandatory minimum for those convicted of a crime while using a visible firearm. The issue there was whether a “sentencing consideration,” such as the presence of a firearm, need be proven by more than a preponderance of evidence. The Court held, affirming a long tradition, that proof by a preponderance of evidence is sufficient in the sentencing context. Here, however, we are not dealing with sentencing. Sentencing occurs during and is part of the criminal proceeding; its purpose is to specify the sanction to be imposed as a result of one’s conviction by proof beyond a reasonable doubt. A Megan’s Law hearing, by contrast, is a civil proceeding that stands apart from the criminal proceeding in which one was convicted and sentenced. See C.A., 679 A.2d at 1164.[29] Moreover, as we have discussed, the factual determinations required in a Megan’s Law hearing are of greater complexity than those typically involved in sentencing. Accordingly, we conclude that it is entirely consistent with McMillan to require a higher standard of proof in a Megan’s Law proceeding.
VII. CONCLUSION
Application of Megan’s Law to the class certified by the district court will not violate the Ex Post Facto or Double Jeopardy Clauses of the Constitution. The Due Process Clause, however, would be violated by any Tier 2 or Tier 3 notification that occurred without a prior opportunity to challenge the registrant’s classification and notification plan in a hearing at which the prosecutor has the burden of persuasion and must prove her case by clear and convincing evidence. Accordingly, the judgment of the district court will be reversed and this matter will be remanded with instructions (1) to enter an injunction foreclosing notification in Tier 2 and Tier 3 cases without compliance with these requirements of procedural due process, and (2) to deny any further relief.

. The list of crimes was expanded in order to comply with the federal registration law, which became effective September 13, 1994, and conditioned the availability of certain funds upon the creation of a sex offender registration program. See Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Pub.L. No. 103-322, Title XVII, § 170101, 108 Stat.2038 (1994) (codified at 42 U.S.C. § 14071). On May 17, 1996, the president signed a federal version of Megan’s Law, which added a mandatory notification provision to the registration requirements. Pub.L. No. 104-145, 110 Stat. 1345 (1996) (codified at 42 U.S.C. § 14071(d)).

. The specific factors and their organization are as follows:
Seriousness of Offense — (1) Degree of Force; (2) Degree of Contact; (3) Age of Victim; Offense History' — (4) Victim Selection; (5) Number of Offenses/ Victims; (6) Duration of Offensive Behavior; (7) Length of Time Since Last Offense; (8) History of Antisocial Acts; Characteristics of Offender — (9) Response to Treatment; (10) Substance Abuse;
Community Support — (11) Therapeutic Support; (12) Residential Support; and (13) Employment/Educational Stability.
Manual at 6-10; Scale, W.P.App. at 712.

. The typical warning included in notification materials reads:
Any actions taken by you against this individual, including vandalism of property, verbal or written threats of harm or physical assault against this person, his or her family or employer will result in your arrest and prosecution for criminal acts. THIS INFORMATION IS CONFIDENTIAL!
See, e.g., W.P.App. at 625-27 (emphasis in original).

. The statute already provided the "likely to encounter" limitation for Tiers 1 and 3. N.J.S.A. 2C:7-8c(l), (3).

. The defendants initially appealed the district court’s ruling to this court, but later withdrew their appeals when the district court entered summary judgment in their favor in W.P. v. Poritz, 931 F.Supp. 1199 (D.N.J.1996).

. There is some ambiguity as to the number of individual sex offenders whose experiences are represented in the record. In some cases, there are multiple affidavits from family members, landlords, employers, and attorneys. In a few submissions by these third parties, the sex offender’s name has been redacted or referenced solely by initials, and we cannot discern whether the information refers to a sex offender already included in the record. The Attorney General characterizes the evidence as discussing the "perceptions .or experiences of a total of only twenty-one individual sex offenders,” six of whom have been subject to notification. Appellee-Vemiero’s Br. at 43. The appellants de *1089 scribe the record as including "affidavits of twenty-one persons who were affected by the public disclosure of a prior sex offense.” Reply Br. at 17.
Our review reveals 17 affidavits from registrants describing the community’s reaction to the knowledge of the individual’s sex offenses. In addition, there are family member affidavits that clearly identify two other cases. Hence, we say we have evidence regarding the experiences of at least 19 sex offenders. The record is, however, clear that notification has issued for six of these offenders.

. One such source is the publicity attending a public arrest and trial. A good example of this is E.B.’s case, where an intense search effort by the Guardian Angels and others resulted in the publication of his name on a radio talk show and in numerous flyers. See Richard Cowen, Guardian Angels Vow to Find ‘E.B.’, The Record, Northern New Jersey, Jan. 26, 1996; Michael Markowitz, Radio Show Airs E.B.’s Name, The Record, Northern New Jersey, Jan. 28, 1996, at A3; Susan Edelman, Guardian Angels Warn Residents, The Record, Northern New Jersey, Jan. 29, 1996, at A3. (Although E.B. presses his own claim, his experiences are also a part of the W.P. record.) Another source is New Jersey's required notification to victims at the time of the offender’s parole consideration and the time of his release. See N.J.S.A. 30:4-123.45, 123.48; N.J.S.A. 52:4B-44.

. In the single assault incident, a registrant was "punched in the nose when he answered his door.” Sheila Donnelly & Roxanne Lieb, Washington's Community Notification Law: A Survey of Law Enforcement 7 (Dec.1993).

. Consideration of constitutional issues is not inconsistent with the expectation of the Doe Court that Megan's Law proceedings in the trial court will be summary in nature. Once the constitutional issues raised by that law are authoritatively resolved, they will no longer be a component of the routine process.

. Where, as here, the state Supreme Court exercises its discretion against review, certiorari will lie from the intermediate appellate court to the Supreme Court of the United States. See Interstate Circuit, Inc. v. Dallas, 390 U.S. 676, 678 n. 1, 88 S.Ct. 1298, 1300 n. 1, 20 L.Ed.2d 225 (1968); Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 160, 74 S.Ct. 396, 98 L.Ed. 583 (1954).

. We note that E.B. does not seek to enjoin future proceedings against him under Megan's Law. Cf. Centifanti v. Nix, 865 F.2d 1422, 1430 (3d Cir.1989). Rather he seeks relief from a judicial judgment in a Megan's Law proceeding that has already terminated. See Valenti, 962 F.2d at 297.

. As with standing, which also "goes to the subject matter jurisdiction of the ... court,” Page v. Schweiker, 786 F.2d 150, 153 (3d Cir.1986), jurisdiction over the claims of a single representative plaintiff allows a court to reach the class claims. See Sosna v. Iowa, 419 U.S. 393, 402-03, 95 S.Ct. 553, 558-59, 42 L.Ed.2d 532 (1975); see generally Wright & Miller, 7A Federal Practice and Procedure § 1755 (noting that rule authorizing class actions cannot be construed to broaden or limit subject matter jurisdiction of district courts).

. In the district court, the Attorney General asked that W.P. be dismissed on grounds of Younger abstention. The district court rejected that contention before entering its preliminary injunction. Although Younger abstention was raised again in the Attorney General’s interlocutory appeal from the preliminary injunction, that appeal was withdrawn when the district court entered summary judgment for the defendants. In the appeal now before us, the Attorney General does not ask us to abstain from adjudicating the plaintiffs’ constitutional claims; he asks rather that we affirm the district court’s adjudication of those claims in his favor. We have no occasion to review the district court's disposition of the Younger abstention issues because the "State voluntarily chooses to submit to a federal forum." Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 480, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977).
The Sussex County prosecutor, also a defendant in W.P., urges in his brief that the district court erred in failing to abstain but does not ask us to remand with instructions to dismiss. Rather, he asks us to affirm the judgment in his favor if we agree with the district court and to abstain and “remit the named plaintiffs to the state courts” if we do not. Appellee-Dennis O'Leary's Br. at 41. Thus, the Sussex County prosecutor also "voluntarily chooses” to submit to this court's jurisdiction. Hodory, 431 U.S. at 480, 97 S.Ct. at 1904. Moreover, to the extent that he purports to adopt a contrary position to that asserted by New Jersey’s Attorney General, we do not believe that he is entitled to do so. Brown v. Hotel & Restaurant Employees & Bartenders Int'l Union, 468 U.S. 491, 500 n. 9, 104 S.Ct. 3179, 3184 n. 9, 82 L.Ed.2d 373 (1984) (notwithstanding the objection of the New Jersey Casino Commission, because "the State’s Attorney General has ... agreed to our adjudication of the controversy, considerations of comity are not implicated, and we need not address the merits of the Younger abstention claim.”).

. To the contrary, we believe the Court’s opinion in Ursery confirms, directly or indirectly, that, inter alia, (1) measures motivated by retributive animus are punishment, (2) even when the legislative action is not so motivated, an adverse consequence resulting from an in personam proceeding may be punishment if it is disproportionate to the remedial goal which the measure purports to pursue, and (3) measures that have traditionally been regarded as nonpunitive are not punishment in the absence of a retributive motive. If we considered ourselves free to disregard the Artway standard, we would be required, once again, to "divine” a "test for punishment” by looking for common considerations in essentially the same set of Supreme Court precedents. Artway, 81 F.3d at 1254. With the one exception noted hereafter in the text, we see no reason to believe our result would be materially different if we repeated that process.

. This aspect of Hendricks was foreshadowed in Ursery where, as we have noted, the Court entertained a double jeopardy challenge to federal civil forfeiture legislation. After concluding that Congress had not intended the legislation as punitive, the Court observed:
Moving to the second stage of our analysis, wefind that there is little evidence, much less the “clearest proof" that we require, suggesting that forfeiture proceedings under 21 U.S.C. §§ 881(a)(6) and (a)(7), and 18 U.S.C. § 981(a)(1)(A), are so punitive in form and effect as to render them criminal despite Congress’ intent to the contrary.
Ursery, at -, 116 S.Ct. at 2148 (internal quotation marks and citations omitted).

. The Legislature finds and declares:
a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.
b. A system of registration of sex offenders and offenders who commit other predatory *1097 acts against children will provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons.
N.J.S.A. 2C:7-1; Artway, 81 F.3d at 1264.

. The only other legislative history is the following statement that accompanied the bill when it was introduced in the stale senate:
Heinous crimes have been committed against children after [sex offenders'] release from incarceration. The most recent case involves the tragic rape and murder of seven-year-old Megan Kanka of Hamilton Township by a neighbor who had committed sex offenses against children. Residents of the neighborhood had no knowledge of the man’s criminal history.
Because sex offenders are likely to be unsusceptible to the "cures” offered by the prison system, the urges that cause them to commit offenses can never be eliminated but merely controlled. The danger posed by the presence of a sex offender who has committed violent acts against children requires a system of notification to protect the public safety and welfare of the community.
Senate Bill No. 14 (N.J. Sept. 12, 1994); Artway, 81 F.3d at 1264.

. Appellants assert that all we determined in Artway was that the actual purpose of registration is remedial; they claim we said nothing about the legislative purpose for notification. They are mistaken. In Artway, we used what appeared to us to be the nonpunitive actual purpose of notification as the predicate for determining that the motivation for registration is remedial as well. See 81 F.3d at 1264 ("[I]f the legislature's actual purpose in notification was remedial, it is hard to imagine that its purpose in the predicate and less harsh step of registration was punitive.”).

. As the Court expressly recognized in Hendricks, "[plrevious instances of violent behavior are an important indicator of future violent tendencies.” — U.S. at -, 117 S.Ct. at 2080 (quoting Heller v. Doe, 509 U.S. 312, 323, 113 S.Ct. 2637, 2644, 125 L.Ed.2d 257 (1993)).

. New Jersey law specifically guarantees public access to all court records, including those concerning criminal prosecutions. See Doe, 662 A.2d at 407(citing Executive Order No. 123). Moreover, as the New Jersey Supreme Court noted in Doe, any person, under New Jersey law, "may obtain a complete criminal history from the State Police by providing a name and either date of birth or social security number and paying a fifteen dollar fee." Id.

. "Rap Sheets” are less readily available today than in days past, but this reflects a policy judgment about the appropriate balance between the defendant’s interest in getting a new start and the interest of others who might find "Rap Sheet” information relevant to their decision making. See Department of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 764-65, 109 S.Ct. 1468, 1477-78, 103 L.Ed.2d 774 (1989) (observing federal and state statutory and regulatory limitations on access to "Rap Sheets”). It does not reflect a general understanding that the dissemination of “Rap Sheet” information by the government is additional punishment.
While the Supreme Court recognized in Reporters Committee that "Rap Sheets” are protected under the privacy-for-law-enforcement-records exemption to the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(C), such protection reflects a Congressional policy judgment, not federal Constitutional law. See id. at 762 n. 13, 109 S.Ct. at 1476 n. 13. The Court explained:
The question of the statutory meaning of privacy under the FOIA is, of course, not the same as the question whether a tort action might lie for invasion of privacy or the question whether an individual’s interest in privacy is protected by the Constitution. See, e.g., Cox Broadcasting Corp. v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (Constitution prohibits State from penalizing publication of name of deceased rape victim obtained from public records); Paul v. Davis, 424 U.S. 693, 712-714, 96 S.Ct. 1155, 1165-66, 47 L.Ed.2d 405 (1976) (no constitutional privacy right affected by publication of name of arrested but untried shoplifter).

Id.

. Other examples are provided by the New Jersey statutes requiring public notice when an adult inmate is considered for parole and notice lo victims upon a defendant's release from incarceration. See N.J.S.A. 30:4-123.48g & 123.45b(5); N.J.S.A. 52:4B-44b(21).

. Reporters Committee, 489 U.S. at 749, 109 S.Ct. at 1469-70, does not call Paul's teaching into question. We do not agree with the Supreme Court of New Jersey’s conclusion in Doe that the recognition in Reporters Committee of a statutory right to privacy for "Rap Sheets” under FOIA dictates that a federal Constitutional right to privacy is implicated by notification. See Doe, 662 A.2d at 410-11. As mentioned above, Reporters Committee noted the differences between "privacy” under FOIA and an "individual’s interest in privacy” under the federal Constitution. 489 U.S. at 762 n. 13, 109 S.Ct. at 1476 n. 13.

. As we explained in Planned Parenthood of Southeastern Pennsylvania v. Casey, 947 F.2d 682, 688 n. 1 (3d Cir.1991), aff'd in part and rev’d *1104 in part, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992):
Government interference with personal rights within the scope of the life, liberty, or property umbrella of the Due Process Clauses must be justified by a legitimate state interest; government interference with a "fundamental right” may be justified only by the most important of state interests.

. The Supreme Court has held that "[ajmong the historic liberties ... protected [by the Constitution is] a right to be free from ... unjustified [state] intrusions on personal security.” Ingraham v. Wright, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977). For citizens who are not in the custody of the slate, however, this right does not include the right to state protection from private violence. See DeShaney v. Winnebago County Dep't of Soc. Services, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The "state created danger” cases based upon this right to personal security do not recognize a right that is implicated here because they do not involve situations where the risk created is justified by the state’s pursuit of a legitimate public interest. See, e.g., Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720 (3d Cir.1989).

. Compare Tony L. v. Childers, 71 F.3d 1182 (6th Cir.1995), cert. denied, - U.S. -, 116 S.Ct. 1834, 134 L.Ed.2d 938 (1996) (holding that state statutes which merely establish procedures and do not mandate any particular substantive result do not give rise to a state-created "liberty interest”).

. While it is clear that deprivation of a state created liberty interest triggers due process protection, and that a state created right to be free of physical restraint is such an interest, the scope of the phrase "liberty interest” as used in the context of the Due Process Clause has not been fully delineated. See, e.g., Paul, 424 U.S. at 708-09, 96 S.Ct. at 1164 (observing that deprivation of a state law right to obtain liquor in anonymity when combined with the stigma of defamation would implicate a state-created "liberty interest,” while the stigma alone would not do so). The phrase "property interest” in this context has been broadly construed, however, to include contract rights, choses-in-action, and a right to state created benefits. See, e.g., Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 807, 105 S.Ct. 2965, 2972, 86 L.Ed.2d 628 (1985) (legal and equitable claims); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9-10, 98 S.Ct. 1554, 1560-61, 56 L.Ed.2d 30 (1978) (utility service); Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975) (school attendance); Perry v. Sindermann, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972) (employment contract). Indeed, "property interest” has been interpreted so as to extend procedural due process protection to virtually all rights that states will enforce in a court of law. With this background, we believe that the Supreme Court would interpret "liberty interest” in the context of the Due Process Clause to include a state created right to privacy like that recognized in Doe.

. As we have noted, appellants also argue that the notice of a proposed notification cannot be dispensed with in emergency situations as the Supreme Court of New Jersey has suggested. We decline to address that issue for the same reason that we declined to do so in Artway — it is unripe. 81 F.3d at 1252; see Abbott Labs. v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). "The right to notice is not absolute;” instead, due process provides for a right to " 'reasonably calculated’ notice.” Artway, 81 F.3d at 1252 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). "[T]he State cannot dispense with notice when that notice is possible and irreparable harm could result.” 81 F.3d at 1252; see United States v. Raffoul, 826 F.2d 218, 224 (3d Cir.1987).
The Megan’s Law standard for dispensing with notice, as articulated in Doe and the Guidelines, involves cases where it is “impossible as a practical matter” to give notice or to do so in a timely manner. 662 A.2d at 382; Guidelines at 17. None of the representative plaintiffs asserts that his notification issued absent notice; nor is there anything in the record indicating that New Jersey’s prosecutors have ever dispensed with notice or plan to do so. The only indication we have as to what circumstances would meet the standard is the suggestion in the Guidelines that a prosecutor may apply for a court order to effect notification absent notice where she does not receive notice of the release of a sex offender until after the date of release or she can demonstrate that she made “eveiy good faith effort” to serve a registrant who merely avoided service. Guidelines at 17-18. As in Artway, we simply do not have the necessary "factual matrix” against which to evaluate this standard. 81 F.3d at 1252.
There is another consideration which, as it did in Artway, would prevent us from reaching the notice issue here—the Pullman abstention doctrine. Id. at 1252 n. 12; see Railroad Comm’n v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The New Jersey courts have yet to interpret the "impossible as a practical matter” standard, and "[t]o the extent state court interpretation would make the standard comport with due process, abstention would probably be appropriate even if the issue were ripe.” 81 F.3d at 1252 n. 12.

. Because tier classification is a civil process, the deference due state criminal procedures, see, e.g., Cooper v. Oklahoma, - U.S. -, -, 116 S.Ct. 1373, 1377, 134 L.Ed.2d 498 (1996), is not applicable here.